**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 28, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 04-4194

LEONARDO PORTILLO-VEGA, also
known as JOSE GALVAN, also known
as LEONARDO ALCARRAS-
GALVAN,

Defendant - Appellant.

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:03-CR-235-01-JTG)**

---

Howard A. Pincus, Assistant Federal Public Defender (Raymond P. Moore,
Federal Public Defender, with him on the briefs) for Defendant - Appellant.

Dustin B. Pead, Assistant United States Attorney (Paul M. Warner, United States
Attorney, with him on the brief), Salt Lake City, Utah, for Plaintiff - Appellee.

---

Before **BRISCOE**, Circuit Judge, **ANDERSON**, Senior Circuit Judge, and
**O'BRIEN**, Circuit Judge.

---

**O'BRIEN**, Circuit Judge.

Leonardo Portillo-Vega was indicted with one count of illegal re-entry after deportation in violation of 8 U.S.C. § 1326. He filed a notice of intent to present a duress defense and a motion for a jury instruction to that effect. After the district court denied his motion and granted the government's motion in limine to preclude the defense, Portillo-Vega proceeded to trial. He was convicted and sentenced to seventy-seven months imprisonment. He timely appealed. Exercising jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we affirm.

Background

In June 2000, Portillo-Vega was convicted of illegal re-entry after deportation and sentenced to a term of imprisonment. He was ordered deported and was permanently barred from re-entering the United States. In March 2002, after completing his sentence, Portillo-Vega was deported through Hidalgo, Texas. On March 7, 2003, officers responding to a suspicious person call found Portillo-Vega in a Provo, Utah motel. A record check indicated he was a "previously removed person." (R. Vol. VI at 2, ¶7 (quotations omitted).) Portillo-Vega was arrested and incarcerated in the Utah County Jail.

On March 10, 2003, Special Agent Carlos Gamarra of the United States Immigration Customs Enforcement interviewed Portillo-Vega. Portillo-Vega

acknowledged his previous deportations,[1] including the one in March 2002, and admitted he illegally re-entered the United States through Nogales, Arizona, on November 27, 2002. Portillo-Vega signed a sworn statement to this effect. He also signed a Form I-826, a notice of rights and disposition form, in which he checked the box admitting he was in the United States illegally and stating he wished to return to his home country.[2]

On April 2, 2003, Portillo-Vega was indicted with illegal re-entry after deportation in violation of 8 U.S.C. § 1326. Over six months later, on October 29, 2003, Portillo-Vega filed a notice of intent to raise a duress defense, a motion for a jury instruction on the duress defense and a request for an evidentiary hearing. The government filed a motion in limine to preclude Portillo-Vega from introducing evidence of duress at trial. After a hearing, during which Portillo-Vega made a proffer of evidence but called no witnesses, the district court found Portillo-Vega had not carried his burden of establishing the elements of a duress defense, denied his motion for a jury instruction on duress, and granted the government's motion to preclude Portillo-Vega from introducing any evidence of duress.

---

[1] Prior to his March 2002 deportation, Portillo-Vega had been deported five times.

[2] The form contained another box which an individual could check if he believed he faced harm in his own country. The form indicated that if the individual harbored such belief the matter would be referred to the immigration court for a hearing. Portillo-Vega did not check this box.

Portillo-Vega and the government attempted to negotiate a conditional plea, pursuant to which Portillo-Vega would acknowledge his guilt but reserve the right to appeal the district court's ruling precluding the duress defense. When approval for the conditional plea could not be obtained, Portillo-Vega proceeded to a jury trial. The government called witnesses to establish Portillo-Vega's previous deportations and his admission of illegal re-entry into the United States. Portillo-Vega took the stand in his own defense. He admitted to previous deportations, his 2000 illegal re-entry conviction, and his 2002 re-entry into the United States. Consistent with the district court's order, Portillo-Vega did not attempt to justify his re-entry as the product of duress. The jury returned a verdict of guilty.

A presentence report (PSR) was prepared. Portillo-Vega objected to the PSR, arguing he was entitled to a two-level reduction in his base offense level for acceptance of responsibility. At sentencing on July 28, 2004, he orally moved for a downward departure based on his having illegally re-entered the United States under duress and requested a sentence at the bottom of the guideline range. The district court granted an acceptance of responsibility reduction but denied Portillo-Vega's motion for downward departure. The court found the applicable guideline range to be seventy-seven to ninety-six months and sentenced Portillo-Vega to seventy-seven months imprisonment.[3]

_____

[3] Portillo-Vega was also sentenced to eighteen months for violating his supervised release. Nine months of that sentence was to be served concurrently with the sentence imposed for the illegal re-entry and the remaining portion was

Discussion

1. Duress defense

Portillo-Vega challenges the district court's decision precluding his duress defense. He argues his proffer was sufficient and he is entitled to a new trial.

"We respect the trial judge's role as gatekeeper" and review the denial of a duress defense for abuse of discretion. *United States v. Al-Rekabi*, 454 F.3d 1113, 1123 (10th Cir. 2006); *see also United States v. Patton*, 451 F.3d 615, 637 (10th Cir. 2006).[4] The defendant bears the burden of proving this defense by a preponderance of the evidence. *See Dixon v. United States*, -- U.S. --, 126 S.Ct. 2437, 2447-48 (2006) (holding that in the usual case the defendant will bear the burden of proving the duress defense by a preponderance of the evidence); *see also Al-Rekabi*, 454 F.3d at 1122 ("[The defendant] must prove his claimed defenses by a preponderance of the evidence. The government is not required to disprove them."). "While we view the evidence favorably to [the defendant], we also recognize his burden of proof on the defense and his corresponding obligation to produce evidence on each element of that defense." *Al-Rekabi*, 454 F.3d at 1123.

_____

to run consecutively. That sentence is not at issue in this appeal.

[4] *Al-Rekabi* involved a defense of necessity. Necessity and duress are both affirmative defenses. While common law historically distinguished between the two, modern cases have "blur[red] the distinction between duress and necessity." *United States v. Bailey*, 444 U.S. 394, 409-10 (1980).

A duress defense "requires the establishment of three elements: (1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm." *United States v. Merchant*, 992 F.2d 1091, 1096 (10th Cir. 1993) (citing *United States v. Scott*, 901 F.2d 871, 873 (10th Cir. 1990)). A defendant must carry his burden on each of the elements; if the evidence is insufficient on even one element, "the trial court and jury need not be burdened with testimony supporting other elements of the defense." *Bailey*, 444 U.S. at 416; *see also Al-Rekabi*, 454 F.3d at 1122 ("To qualify for an instruction on an affirmative defense . . . a defendant must produce evidence of each element sufficient to warrant its consideration by the jury."); *Scott*, 901 F.2d at 873 ("If the evidence is lacking as to any element of the coercion defense the trial court may properly disallow the defense as a matter of law and refuse to instruct the jury as to coercion.").

Portillo-Vega filed a notice of intent to present a duress defense and a motion for a jury instruction on duress. He alleged he had "sufficient credible evidence" on each element of the defense and filed a list of proposed witnesses and a memorandum in support of the requested jury instruction. (R. Vol. I, Doc. 24 at 1.) In each of these documents, Portillo-Vega set forth his account of events which necessitated his illegal re-entry into the United States in November 2002. The government filed a motion in limine asking the district court to prohibit

Portillo-Vega from introducing any evidence related to the alleged duress defense. The district court held a hearing on the parties' motions. Pursuant to the parties' agreement, no witnesses were called; instead, Portillo-Vega made a proffer of evidence and each party argued the relevant law.

Portillo-Vega outlined the following sequence of events:[5] In 1986, Portillo-Vega was detained by border authorities on a 1982 warrant out of Wilcox or Wilcox County, Arizona, for failure to pay a fine. The officer who transported Portillo-Vega to court asked him if he knew certain individuals "who picked lettuce but who also sold drugs." (R. Vol. I, Doc. 40 at 2.) When Portillo-Vega indicated he knew the individuals, he was referred to the local office of the Drug Enforcement Administration (DEA), where Portillo-Vega had his photograph taken and signed paperwork agreeing to work for the DEA. The DEA provided him a bus ticket to Mesa, Arizona. Portillo-Vega traveled to Mesa but ended up in San Luis, Mexico. After a few weeks, he was picked up by the DEA and taken to its Phoenix office. Portillo-Vega signed more paperwork agreeing to work for the DEA; the DEA agreed to pay him $3,000 for every kilo of cocaine he purchased. A controlled buy was arranged but was botched by the obvious presence of DEA agents at the location of the buy. Portillo-Vega was angered by

_____

[5] This chronology is compiled from Portillo-Vega's memorandum in support of his motion for a jury instruction on the duress defense, the witness list provided to the court in support of the motion, and the statements and argument of counsel during the hearing.

the DEA agents' actions. Believing he was in danger, Portillo-Vega decided to disappear.

On March 1, 2002, Portillo-Vega was deported from the United States after serving a prison term for illegal re-entry. He stayed in a hotel on the border for a day or two, where he was picked up by the Federal Mexican Police (the Federales). The Federales took Portillo-Vega to a government building in a different city (Torreon) and accused him of working with the DEA to "bust Mexicans." (R. Vol. I, Doc. 43 at 3.) While there, Portillo-Vega overheard other people "expressing their opinion that they should kill him." (*Id.*) The Federales released Portillo-Vega and he left town, first traveling to Juarez, where he attempted to cross the border "to report to U.S. officials what was happening to him." (*Id.* at 4.) A customs agent threatened to arrest Portillo-Vega if he did not return to Mexico. Thus, Portillo-Vega continued on to Tijuana, arriving sometime in mid-March. Portillo-Vega began working at a carwash called "Autoservicio y Lavado Jet." (*Id.*) In October 2002, the Federales located Portillo-Vega and again accused him of working with the DEA.[6] They threatened him "with death or serious bodily injury" if he did not leave the country. (*Id.*) Portillo-Vega re-

_____

[6] There was conflicting evidence as to when the Federales contacted Portillo-Vega in Tijuana. According to Portillo-Vega's written memoranda, the Federales contacted him "approximately six months" after his arrival in Tijuana, *i.e.*, in September 2002. (R. Vol. I, Doc. 40 at 4; Doc. 43 at 4.) However, at the proffer hearing, Portillo-Vega's counsel stated the Federales contacted Portillo-Vega in late October 2002.

entered the United States on November 27, 2002, through Nogales, Arizona. He did not contact law enforcement upon his arrival because he feared being returned to the Federales in Mexico.

Portillo-Vega proposed to call several witnesses. Miguel Angel Sanz, Portillo-Vega's employer in Tijuana, would verify Portillo-Vega's dates of employment and testify "he was a stable and good employee who suddenly after about six months of employment got nervous about the Federales and suddenly left." (R. Vol. I, Doc. 40 at 5.) Joel Sanz would testify in accordance with Miguel Sanz's testimony. A co-worker, Kaluchi Rodriguez, would testify that Portillo-Vega "confided in him that the Federales were going to kill him." (*Id.*) Hector Samuel Smith Navidad, who worked at the junk yard behind the carwash where Portillo-Vega worked, "was working when Federales came and took [Portillo-Vega] and threatened him." (*Id.*) He would testify Portillo-Vega was "very frightened and quickly left." (*Id.*)

Portillo-Vega also proposed to call his sister, Amelia Beltram, although he had lost contact with her. Beltram would testify "the account in this pleading is substantially similar to what [Portillo-Vega] told her when he crossed the border and visited her." (*Id.*) Wilfredo Vega, Portillo-Vega's half brother, was "believe[d]" to be able to corroborate Beltram's testimony. (*Id.* at 6.) Additionally, Portillo-Vega proposed to call Gustavo Vasquez, a retired DEA agent, as an expert on the negative treatment DEA informants receive from the

Federales. Finally, Portillo-Vega intended to testify regarding the above events.[7]

At the hearing, defense counsel argued the first element of the duress defense — an immediate threat of death or serious bodily injury — would be proven through the testimony of Portillo-Vega, Smith Navidad, and Miguel Sanz.[8] These witnesses would provide evidence of Portillo-Vega's fear of the Federales, the threats made to him and the timing of the threats, which began in March 2002 and continued until October or November 2002. Testimony on the second element of the duress defense — a well-grounded fear that the threat will be carried out — would be provided by the retired DEA officer, Vasquez. Defense counsel did not specifically articulate which witnesses would testify about the third element of the defense — whether Portillo-Vega had a reasonable opportunity to escape the threatened harm — but argument on the point implied Portillo-Vega's testimony would be paramount. Counsel also informed the district court he was trying to locate the border agent with whom Portillo-Vega

---

[7] At the hearing, defense counsel admitted he had no written statements from any of the proposed witnesses. In fact, his investigator had relied on an interpreter regarding what the witnesses were saying.

[8] On appeal, Portillo-Vega states he "would have testified that the Federales actually beat him." (Appellant's Br. at 30.) This statement is not supported by the record. The documents filed in district court state the Federales "threatened" Portillo-Vega, but make no allegation of actual physical harm. (R. Vol. I, Doc. 40 at 4; Doc. 43 at 3-4.) During the hearing, defense counsel stated Portillo-Vega was "threatened" and "was quite shaken up" by his encounters with the Federales. (R. Vol. II at 15.) Counsel did comment "they did bodily harm" to Portillo-Vega (*id.* at 16) but never indicated Portillo-Vega would testify he was actually beaten.

spoke in Juarez to corroborate that Portillo-Vega was not permitted to enter the United States at that time. Lastly, counsel argued Portillo-Vega's other means of escape (turning himself into the Mexican authorities or fleeing to Guatemala) were unreasonable.

The district court ruled Portillo-Vega failed to carry his burden on any element of the duress defense. With respect to the first element, the court acknowledged Portillo-Vega could testify about all the events he alleged occurred. The district court noted, however, the lack of any documentary evidence demonstrating Portillo-Vega ever worked for the DEA and the length of time which lapsed between his alleged association with the DEA (1986), his six subsequent deportations, and his illegal re-entry in November 2002. "It seems like the most logical explanation for [his re-entry in November 2002] was that he was coming back to see his family." (R. Vol. III at 9.) The court also noted the "amorphous" nature of the threats and that "[no specific facts were given." (*Id.*) As to the second element, the court found Portillo-Vega's conduct after the March 2002 threats (going to a border town where the Federales were always present rather than fleeing "deep into the heart of Mexico" or returning to the United States) was incongruous with having a well-grounded fear the threats would be carried out. (*Id.*) It also noted Portillo-Vega's admission that he had no fear of returning to Mexico. The district court further found as a matter of law that Portillo-Vega had failed to carry his burden with respect to the third element. It

reviewed the options available to Portillo-Vega to express his fear of the Federales and his complete failure to avail himself of those opportunities. Thus, the court denied Portillo-Vega's motion for a jury instruction on duress and granted the government's motion in limine precluding the raising of the defense at trial.

On appeal, Portillo-Vega argues he was entitled to present evidence of this defense to the jury. He expends much effort re-arguing the proffered evidence, contending the jury could have found certain facts to exist or could have believed certain testimony. However, the issue is not what the jury might have believed. The issue is whether Portillo-Vega carried his burden of establishing, by a preponderance of the evidence, each element of a duress defense. He did not.

Portillo-Vega relies on *United States v. Bailey* in support of his argument he has an absolute right to have a jury consider his defense. 444 U.S. 394 (1980). Just as "*Bailey* critically informs any discussion of the necessity defense," *Al-Rekabi*, 454 F.3d at 1124, so too is it central to a discussion of the duress defense.

In *Bailey*, inmates charged with escape sought to raise defenses of duress or necessity, alleging dangerous prison conditions forced them to flee. *Bailey*, 444 U.S. at 398. The district court refused to instruct the jury on either defense and the inmates were convicted. *Id.* at 399-400. On appeal, the inmates alleged they presented "sufficient evidence of duress or necessity to submit such a defense to the jury." *Id.* at 409. In affirming, the Supreme Court reviewed the defendant's

-12-

burden to present evidence on each element of the duress defense and held the insufficiency of evidence on any one element precluded consideration by the jury of evidence on all of the elements:

> [It is essential that the testimony given or proffered meet a minimum standard as to each element of the defense so that, if a jury finds it to be true, it would support an affirmative defense - here that of duress or necessity.
>
> . . . .
>
> If . . . an affirmative defense consists of several elements and testimony supporting one element is insufficient to sustain it even if believed, the trial court and jury need not be burdened with testimony supporting other elements of the defense.

*Id.* at 415-16.

> The Court also concluded escape was a continuing offense:

> [Escape from federal custody . . . is a continuing offense and . . . an escapee can be held liable for failure to return to custody as well as for his initial departure.  Given the continuing threat to society posed by an escaped prisoner, the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one.

*Id.* at 413 (quotations omitted).  It held a defendant charged with escape who raises a duress or necessity defense, "must proffer evidence of a bona fide effort to surrender or return to custody as soon as the claimed duress or necessity had lost its coercive force."  *Id.* at 415.

Applying these concepts to the facts here, it is clear the district court did not abuse its discretion in rejecting Portillo-Vega's duress defense.  The district

court carefully reviewed the proffered evidence and concluded Portillo-Vega had failed to establish any of the elements by a preponderance of the evidence. Moreover, applying the analysis set forth in *Al-Rekabi*, we conclude illegal re-entry after deportation is a continuing offense. 454 F.3d at 1124. It occurs not just when the previously-deported individual steps across the border without permission to do so but continues as long as that individual remains in the United States.[9] Thus, to successfully raise a duress defense, Portillo-Vega had to "proffer evidence of a bona fide effort to surrender . . . as soon as the claimed duress . . . had lost its coercive force." *Bailey,* 444 U.S. at 415; *see also Al-Rekabi*, 454 F.3d at 1124. This is "an indispensable element of the defense of duress or necessity." *Bailey*, 444 U.S. at 415. "Demanding a prompt and appropriate remedial response to the claimed [duress] is a legitimate precondition to recognizing the defense and is also a useful tool in measuring the bona fides of a claimant." *Al-Rekabi*, 454 F.3d at 1124.

The district court did not specifically address the continuing nature of the offense as a separate element but considered it as a subset of the third element, whether there was a reasonable opportunity to escape the threatened harm. The court correctly noted the many opportunities Portillo-Vega had to request assistance from the authorities and his on-going failure to do so. By his own

_____

[9] As the government noted in argument before the district court, were it otherwise, venue for the prosecution would lie in the district where the individual crossed the border, not where he was actually apprehended.

admission, Portillo-Vega was in the United States illegally for over three months before he was apprehended. He admitted he made no effort to contact law enforcement officers, fearing they would just return him to the Federales in Mexico.[10] Portillo-Vega did not even express fear about returning to Mexico when given a direct opportunity to do so during his interview with Agent Gamarra and his completion of the I-826 form. Instead, he checked the box admitting he was in this country illegally and expressing his desire to be returned to his home country.

"The district judge properly exercised [his] gate-keeping responsibilities" by precluding the duress defense. *Al-Rekabi*, 454 F.3d at 1125. Even had Portillo-Vega carried his burden on the first two elements, and we agree with the district court he did not, he failed to carry it on the third element and this failure alone justified a rejection of the defense.

2.    Sentencing

Portillo-Vega was sentenced on July 28, 2004, after *Blakely v. Washington,* 542 U.S. 296 (2004), but prior to *United States v. Booker*, 543 U.S. 220 (2005). Portillo-Vega did not challenge the constitutionality of his sentence in the district

---

[10] Portillo-Vega's purported contact with a border agent in Juarez, shortly after his first encounter with the Federales, does not suffice to demonstrate a bona fide effort to seek assistance or surrender to authorities. It occurred long before his actual re-entry, and whatever its nature, does not justify Portillo-Vega's failure to contact law enforcement once he was within this country and well across the border.

court.  On appeal, Portillo-Vega acknowledges our review is for plain error.  He contends the district court committed non-constitutional *Booker* error by applying the guidelines in a mandatory fashion.

"Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Gonzalez-Huerth*, 403 F.3d 727, 732 (10th Cir. 2005) (quotations omitted).  Non-constitutional *Booker* error satisfies the first two prongs of the plain-error test.  *Id*.; *United States v. Naja*, 451 F.3d 710, 721 (10th Cir.), *cert. denied*, 127 S.Ct. 542 (2006).  Therefore, we limit our review to the third and fourth prongs.  *United States v. ResEdit-Patina*, 420 F.3d 1177, 1183 (10th Cir. 2005), *cert. denied*, 126 S.Ct. 1098 (2006).

In order to satisfy the third prong of plain error review, Portillo-Vega must demonstrate the error "affected the outcome of the district court proceedings." *Gonzales-Huerth*, 403 F.3d at 732-33 (quotations omitted).  "To meet this burden, [Portillo-Vega] must show a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *Id*. at 733 (quotations omitted).  While we "treat the third and fourth prongs [of plain error review] as independent inquiries," we need not address whether Portillo-Vega has met his burden under the third prong because he clearly has not satisfied the fourth prong. *Id*. at 736.

"Under the fourth prong of plain-error review, . . . we will not notice a non-constitutional *Booker* error . . . unless it is both particularly egregious and our failure to notice the error would result in a miscarriage of justice." *ResEdit-Patina*, 420 F.3d at 1184 (quotations omitted). This standard is "formidable" and in most cases involving non-constitutional *Booker* error, a defendant will be unable to meet it. *United States v. Trujillo-Tauruses*, 405 F.3d 814, 820 (10th Cir. 2005). We have identified several factors that might satisfy this fourth prong:

> (a) a sentence increased substantially based on a *Booker* error; (b) a showing that the district court would likely impose a significantly lighter sentence on remand; (c) a substantial lack of evidence to support the entire sentence the Guidelines required the district court to impose; (d) a showing that objective consideration of the § 3553(a) factors warrants a departure from the sentence suggested by the Guidelines; or (e) other evidence peculiar to the defendant that demonstrates a complete breakdown in the sentencing process.

*United States v. Dalian*, 408 F.3d 647, 671 (10th Cir. 2005) (citations omitted).

In support of his argument that resentencing is warranted, Portillo-Vega points to the district court's imposition of a sentence at the bottom of the guideline range. He also argues the court's consideration of the 18 U.S.C. § 3553(a) factors, in particular, his family circumstances, his educational efforts and the disparity created by the existence of "fast track" programs for illegal re-entry defendants in some jurisdictions but not others,[11] would have led to a lesser

---

[11] A "fast-track" program provides for reduced sentences in illegal reentry cases where a defendant pleads guilty. *United States v. Sanchez-Juarez*, 446 F.3d

-17-

sentence.

Portillo-Vega has not satisfied the demanding fourth prong. Portillo-Vega's sentence was "within the national norm for sentences as established by the sentencing guidelines." *ResEdit-Patina*, 420 F.3d at 1184. "[There is no evidence in the record that would lead us to reasonably conclude the district court would impose a sentence outside the guideline range under a post-*Booker* advisory regime." *Id.* That the court sentenced at the bottom of the guideline range is not evidence it would act more leniently in a post-*Booker* environment. Courts must still consult the guidelines and "take them into account when sentencing." *Booker*, 543 U.S. at 264.

The PSR provided the district court information concerning Portillo-Vega's family circumstances and educational efforts. Such information is not so compelling as to "warrant[] a departure from the sentence suggested by the Guidelines," *Dalian*, 408 F.3d at 671, nor is it so "peculiar to [Portillo-Vega] that [it] demonstrates a complete breakdown in the sentencing process." *Id.* Moreover, the court exercised its discretion in denying Portillo-Vega's motion for downward departure. *See United States v. Lawrence*, 405 F.3d 888, 908 (10th Cir.) (finding court's refusal to invoke its discretion to depart is evidence it deemed sentence appropriate and would impose same sentence even under an advisory guidelines system), *cert. denied*, 126 S.Ct. 468 (2005).

1109, 1112 (10th Cir. 2006).

Finally, this case is not like those in which the district court expressed dissatisfaction with its choices under the guidelines or a desire for more leniency. *See*, *e.g.*, *Trujillo-Tauruses*, 405 F.3d at 817, 820. Nor is it one where the sentence is egregious in light of the defendant's offense or criminal history. *Id.* at 819-20 (finding relatively trivial nature of defendant's criminal history was at odds with both the § 3553(a) factors and the sixteen-level enhancement). Considering Portillo-Vega's lengthy history of multiple deportations and illegal reentries, there is nothing that convinces us a remand would produce a different result.

AFFIRMED.