**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 12, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

LUIS NAPOLEON PORTILLO-
MADRID,

    Defendant-Appellant.

No. 08-2030

(D.C. No. CR-06-2483-JEC)
(D. New Mexico)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE, MURPHY,** and **HARTZ**, Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined

unanimously to honor the parties' request for a decision on the briefs without oral

argument.  See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is,

therefore, submitted without oral argument.

Defendant-Appellant Luis Portillo-Madrid entered a conditional guilty plea

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

to unlawful reentry to the United States after previous deportation for an aggravated felony, in violation of 8 U.S.C. § 1326. He was sentenced to forty-six months in prison, followed by two years of supervised release. Portillo-Madrid contends the district court erred by denying his motion to present at trial the "affirmative defense"[1] of duress. We affirm.

## I. Procedural and Factual History

In May 1998, Portillo-Madrid was convicted of felony criminal sexual contact of a child in New Mexico state court. Prior to his 1998 conviction, Portillo-Madrid lived illegally in the United States for thirty years. He served one year of a suspended sentence on the conviction, and was subsequently deported to his native country El Salvador in February 1999.

On September 9, 2006, a New Mexico police officer stopped Portillo-Madrid in Albuquerque when the officer discovered that the make of the vehicle Portillo-Madrid was driving did not match the registration for the vehicle. The officer's investigation revealed that Portillo-Madrid was a citizen of El Salvador

---

[1] In Dixon v. United States, 548 U.S. 1, 8 (2006), the Supreme Court refers to duress as an affirmative defense and states the common law rule that "the burden of proving affirmative defenses–indeed, all circumstances of justification, excuse or alleviation–rest[s] on the defendant." (internal quotation and alteration omitted). Duress is an affirmative defense, see Black's Law Dictionary (8th ed. 2004) (defining affirmative defense as: "A defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true."), although the cases tend to refer to it alternately as an affirmative defense or simply a defense.

and was illegally present in the United States. On September 11, 2006, immigration officials interviewed Portillo-Madrid and he told them that he had reentered the United States by claiming to be a United States citizen. The officers performed a records check and determined that Portillo-Madrid had not applied for or received permission to reenter the United States.

Portillo-Madrid was charged with one count of unlawful reentry to the United States after previous deportation for an aggravated felony, in violation of 8 U.S.C. § 1326. Portillo-Madrid filed a motion requesting the district court to permit him to introduce evidence at trial that he reentered the United States because of his fear that if he stayed in El Salvador, he would be murdered. He argued this evidence would support a necessity and duress affirmative defense to the unlawful reentry charge. The district court held a hearing on the motion in July 2007, and ultimately filed an order excluding the proffered evidence.[2]

At the proffer hearing, Portillo-Madrid's common-law wife, Petronila Argueta, testified that in June 1998, her brother was burned alive in the trunk of a

---

[2] Although Portillo-Madrid's proffer could have been made at trial, see United States v. Bailey, 444 U.S. 394, 412 n.9 (referring to the practice of provisionally admitting evidence of duress at trial for a later determination whether the evidence is sufficient to support a jury instruction), it is also proper to make the proffer prior to trial, see United States v. Portillo-Vega, 478 F.3d 1194, 1197-1202 (10th Cir. 2007) (referring to the practice of holding a pre-trial evidentiary hearing so that the district court may exercise its gate-keeping responsibilities by determining whether sufficient evidence of duress is proffered to entitle a defendant to present the evidence at trial).

car by four men. Argueta testified that she went to court hearings for these men, and that she was responsible for filing a criminal complaint against them. Argueta further testified that at the court hearings, family members of the suspects threatened to kill Argueta, Portillo-Madrid and Argueta's family if she proceeded. Argueta testified that she then withdrew her complaint and fled to the United States with Portillo-Madrid, but they did not enter through a designated port of entry. Argueta testified that she did not seek asylum when she entered the United States, but that she went to a place in Chicago, called the Romero Place, where the people told her they could not help her, other than by assisting her to obtain an eighteen month work permit. She did not testify as to when this occurred.

Portillo-Madrid also testified that he was threatened with death when he attended a court hearing in El Salvador with Argueta. Portillo-Madrid testified that because he was afraid, he came to the United States with Argueta in September 2000. Portillo-Madrid testified that he entered the United States by claiming to be a United States citizen. He also testified that he did not inform the immigration officers who interviewed him after his arrest for illegal reentry that he was afraid of returning to El Salvador. Portillo-Madrid testified that he never sought asylum in the United States, but confirmed that Argueta sought assistance from the Romero House in Chicago while visiting her mother and the people there told her they could not help her, other than to help her obtain a permit to work in

4

the United States for eighteen months.

After the district court's denial of his motion, Portillo-Madrid entered a conditional guilty plea pursuant to a plea agreement which reserved Portillo-Madrid's right to challenge the district court's order excluding his proffered evidence. Portillo-Madrid was sentenced to forty-six months in prison, followed by two years of supervised release.

## II. Legal Standards and Analysis

The affirmative defense of duress "may excuse conduct that would otherwise be punishable." Dixon, 548 U.S. at 6. Specifically, the duress defense allows the defendant to avoid liability where the defendant "was under an unlawful threat of imminent death or serious bodily injury, which threat caused the actor to engage in conduct violating the literal terms of the criminal law." Bailey, 444 U.S. at 409.

We review the district court's denial of the duress defense for an abuse of discretion. Portillo-Vega, 478 F.3d at 1197 (citing United States v. Al-Rekabi, 454 F.3d 1113, 1123 (10th Cir. 2006)). A defendant bears the burden of establishing duress. See Dixon, 548 U.S. at 17 (stating that the affirmative defense of duress will usually need to be established by the defendant by a preponderance of the evidence); see also Portillo-Vega, 478 F.3d at 1197 (holding that the defendant bore this burden in the case of a defendant charged with illegal reentry after deportation). A defendant is entitled to present a defense only when

5

the "theory is supported by some evidence and the law." Al-Rekabi, 454 F.3d at 1121.

"A duress defense 'requires the establishment of three elements: (1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm.'" Portillo-Vega, 478 F.3d at 1197 (quoting United States v. Merchant, 992 F.3d 1091, 1096 (10th Cir. 1993)). "A defendant must carry his burden on each of the elements; if the evidence is insufficient on even one element, 'the trial court and jury need not be burdened with testimony supporting other elements of the defense.'" Id. at 1197-98 (quoting Bailey, 444 U.S. at 416).

"[I]f there was a reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm, the defense[] will fail." Bailey, 444 U.S. at 410 (internal quotation omitted). In addition, for crimes considered continuing offenses, a showing of duress requires the defendant to justify his continued offensive conduct once the claimed duress has lost its coercive force. Id. at 414-15. "[I]llegal re-entry after deportation is a continuing offense." Portillo-Vega, 478 F.3d at 1201 (citing Al-Rekabi, 454 F.3d at 1124).

In Portillo-Vega, a case with facts strikingly similar to this case, the defendant was convicted of illegal reentry after deportation, following the district court's grant of the government's motion in limine to exclude evidence of the

6

defendant's duress affirmative defense. 478 F.3d at 1196. The defendant claimed he had attempted to work for the United States Drug Enforcement Administration ("DEA") performing controlled buys, but was ultimately deported to Mexico. Id. at 1198. Upon his return to Mexico, the defendant alleged he was picked up by the Federal Mexican Police ("Federales") and threatened for working with the DEA to "bust Mexicans". Id. The defendant alleged that he was released from the Federales, but when they located him again, seven or eight months later, they threatened him with death or serious bodily injury if he did not leave the country. Id. at 1199. At that point, the defendant alleged, he reentered the United States; he also alleged he did not contact law enforcement upon his arrival in the United States because he feared being returned to the Federales in Mexico. Id.

In Portillo-Vega, we affirmed the district court's denial of the duress defense on these facts. We emphasized that: the defendant had many opportunities to request assistance from authorities in Mexico, but continuously failed to do so; the defendant was in the United States for over three months before he was apprehended; the defendant made no effort to contact law enforcement officers while in the United States; and when the defendant was apprehended by authorities, he did not express any fear about being deported to Mexico, despite having an opportunity to do so. Id. at 1201-02. We held that the defendant failed to carry his burden establishing all the elements, and that the district court properly exercised its discretion in excluding the affirmative

7

defense.  Id. at 1202.

Here, Portillo-Madrid's appeal fails for the same reasons.  The district court found that Portillo-Madrid did not meet his burden of producing evidence on each element of the duress affirmative defense because "he failed to offer any evidence that he (1) had no lawful alternative to illegally reentering the United States or (2) that he turned himself in to authorities once he was safely here and any threat of imminent harm was dissuaded."  The district court noted that Portillo-Madrid made no effort to contact law enforcement officers at any time while in the United States and that Portillo-Madrid testified that nothing prohibited him from seeking refuge in some other country.[3]

The district court did not abuse its discretion.  Like the defendant in Portillo-Vega, Portillo-Madrid had the opportunity to request assistance from authorities in his native country but did not do so.  Also like the defendant in Portillo-Vega, once Portillo-Madrid was in the United States, he did not contact law enforcement officers or seek asylum.  Although Argueta sought assistance from the Romero Place, she ultimately did nothing more than use their assistance to obtain a work permit.  Also, in Portillo-Vega, we found it significant that the

---

[3] Portillo-Madrid argues that this finding–that nothing prohibited Portillo-Madrid from seeking refuge in some other country–is unsupported by the record because there is no evidence that he would legally be able to do so.  However, regardless of the assumedly intricate legal hoops requisite to Portillo-Madrid seeking refuge elsewhere in Central America, Portillo-Madrid himself testified he was not prohibited from attempting to do so.

8

defendant had been in the United States for three months without seeking assistance. Here, Portillo-Madrid was in the United States for at least six years[4] without contacting law enforcement officers. In addition, like the defendant in Portillo-Vega, Portillo-Madrid did not tell the immigration officers anything about his claimed duress when they initially interviewed him in September 2006. In fact, Portillo-Madrid testified that he was asked whether he feared being removed from the United States and returned to El Salvador, but did not give the immigration officers any information about his fear. Portillo-Madrid alleges that he did not do so because he was nervous and confused, but this does not diminish the fact that he had the opportunity.

Even assuming Portillo-Madrid has carried his burden on the first two elements–an immediate threat of death or serious bodily injury and a well-grounded fear that the threat will be carried out–he failed to establish that there was no reasonable, legal alternative to violating the law for the six years he remained in the United States prior to his arrest for illegal reentry in 2006. Because illegal reentry following deportation is a continuing offense, Portillo-

---

[4] There is conflicting testimony regarding how long Portillo-Madrid and Argueta were in the United States after fleeing El Salvador. Argueta testified it had been eight years, assumedly from the time of the July 2007 hearing, putting them in the United States at some point in 1999 and seven years prior to Portillo-Madrid's illegal reentry after prior deportation charge. Portillo-Madrid testified they came to the United States in September 2000, six years prior to his illegal reentry after prior deportation charge. The actual time period is irrelevant, because even the shortest period (*i.e.*, six years) is quite lengthy.

Madrid is required to justify his continued offensive conduct once the claimed duress has lost its coercive force. Portillo-Madrid wholly fails in this regard. He admits that he never contacted any law enforcement officers or immigration officials after he entered the United States.

Portillo-Madrid argues that he believed he could seek refuge in the United States as long as he obeyed all laws, thereby justifying his six-year silence, but his alleged belief is irrelevant. See United States v. Hernandez-Hernandez, 519 F.3d 1236, 1239-40 (10th Cir. 2008) (holding that the only intent necessary for a charge of being found in the United States after prior deportation is that the defendant's acts were intentional; no intent to break the law is necessary); United States v. Miranda-Enriquez, 842 F.2d 1211, 1213 (10th Cir. 1988) (finding that a mistake defense is not appropriate in a illegal reentry case because there is no criminal intent element in the crime).

In addition, Portillo-Madrid's mistaken belief argument is unsupported by the record. There is evidence that Portillo-Madrid actually had the contrary belief. Argueta testified that before she and Portillo-Madrid came to the United States, they talked about "the crimes he had committed here [in the United States], that he couldn't return here" but "it was the place that he had lived for a long time" and was "the place that he knew best" and, in addition to the fact that Argueta had family in the United States, that was the reason they came to the United States. From this testimony, it appears Portillo-Madrid knew he could not

10

return to the United States, but did so anyway because it was the place where he was the most comfortable. In addition, Portillo-Madrid testified that he was told upon deportation, and understood, that he could not legally return to the United States. He also testified that he thought the law could possibly change once he was in the United States, but this testimony does not equate to a good faith belief that he could seek refuge in the United States as long as he obeyed all laws.

### III. Conclusion

The district court did not abuse its discretion when it rejected Portillo-Madrid's proffered duress evidence. Portillo-Madrid did not carry his burden on each element of the affirmative defense of duress. A defendant is entitled to present a defense only when the "theory is supported by some evidence and the law." Al-Rekabi, 454 F.3d at 1121.

AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge