FILED
United States Court of Appeals
Tenth Circuit

September 30, 2011

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

JUAN ALBERTO
SALDIVAR-MUNOZ, a/k/a Juan
Albert Saldivar-Munoz, a/k/a Juan A.
Saldivar,

        Defendant-Appellant.

No. 10-5162
(D.C. No. 4:10-CR-00080-JHP-1)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **GORSUCH**, and **MATHESON**, Circuit Judges.

Juan Alberto Saldivar-Munoz pleaded guilty to illegal reentry after

previous deportation from the United States, in violation of 8 U.S.C. § 1326(a).

In his plea agreement, Mr. Saldivar-Munoz preserved his right to appeal the

district court's grant of the government's motion in limine to preclude the

---

[*]      After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

admission of evidence regarding his defenses of necessity or duress. Exercising

jurisdiction under 28 U.S.C. § 1291, we affirm.

### *Evidence Presented In Support of*
### *Necessity or Duress Defenses*

A defendant bears the burden of proving duress or necessity at trial by a

preponderance of the evidence. *See United States v. Beckstrom*, 647 F.3d 1012,

1016 (10th Cir. 2011) (duress); *United States v. Al-Rekabi*, 454 F.3d 1113, 1122

(10th Cir. 2006) (necessity). But a defendant has no absolute right to present

such a defense to the jury. *See United States v. Portillo-Vega*, 478 F.3d 1194,

1200-01 (10th Cir. 2007). "It is essential that the testimony given or proffered

meet a minimum standard as to each element of the defense so that, if a jury finds

it to be true, it would support an affirmative defense—here that of duress or

necessity." *Id.* (quotation and bracket omitted). In determining the sufficiency of

the evidence to raise a jury issue, we review the evidence in the light most

favorable to the defendant. *See United States v. Butler*, 485 F.3d 569, 571-72

(10th Cir. 2007).

Mr. Saldivar-Munoz proffered the following evidence in support of his

necessity or duress defenses: He was born in the central-Mexican town of Jalpa,

in the state of Zacatecas, about a twelve-hour drive from the United States border.

His father owns a ranch near Jalpa where the family has grown seed crops and

raised cattle, pigs, and chicken. Most of his family members still live in the Jalpa

area, but Mr. Saldivar-Munoz left Mexico and entered the United States illegally in 1985, at the age of 14. He lived in Tulsa, Oklahoma, where he made his living as a journeyman plasterer. In 2002, he married a United States citizen. He and his wife have three United-States-citizen children.

In 2007, Mr. Saldivar-Munoz was convicted of false impersonation. After serving a prison sentence, he was deported to Mexico in January 2008. His family accompanied him to Mexico, where they lived in his father's house in Jalpa, and he took a job working for the town. At first, everything was fine. But after several weeks, some members of the Zetas gang approached him, saying they wanted him to run drugs over the border. They assured him that the Mexican military checkpoints were under their control, as well as certain officials at the border. The Zetas told him that they targeted him because he could speak English.

Mr. Saldivar-Munoz was not interested in helping the Zetas gang. He knew he would go to jail if he was caught smuggling drugs into the United States. But he was afraid of what the Zetas would do if he refused. He was aware that two of his cousins had been kidnapped. One cousin's family had paid $80,000 in ransom for his release. Mr. Saldivar-Munoz did not know what happened to the other cousin. He made an offer of proof that Carlos Sandoval, an agent with the Bureau of Alcohol, Tobacco, and Firearms, would testify as follows regarding the practices of drug cartels in the border region between Mexico and the United

States:  Much of the border region is controlled by drug cartels whose members bribe public officials, including local and state police.  They also use extortion and violence to intimidate government officials and members of the media who report on their activities.  And they are known to kidnap people in the border regions whose families are perceived to be able to pay a ransom.  Drug cartels often recruit people who are bilingual to carry drugs across the border because they are less likely to arouse the suspicion of law enforcement.  The Gulf cartel is active in the border region, as is its former enforcement arm, the Zetas.  The Zetas grew out of the Mexican military and evolved into a group hired to protect Gulf cartel members and eliminate rivals.  More recently, the Zetas became a separate drug cartel and are known as a violent and vicious group that intimates and kills to support its drug-trafficking agenda.

Mr. Saldivar-Munoz testified that he put off the Zetas by telling them he needed time to think about their proposal.  At some point they gave him a deadline to respond, and he decided it was time to leave.  His wife was afraid and wanted to return to the United States.  A relative advised against packing up his family because the Zetas had spies in the neighborhood.  So Mr. Saldivar-Munoz decided he would depart on his own after dark.  When he got somewhere safe, he would contact his wife and tell her to head out as well.  His goal was to return to the United States. With a family member's help, he left Jalpa in a truck, heading into the mountains to avoid a checkpoint.  He gave this family member about

1,000 pesos for gas. He did not feel safe stopping to ask for help at Mexican checkpoints or at the border, based on the Zetas' representation that these points were under the gang's control. After he left Mexico, men dressed in police uniforms came to the house in Jalpa demanding to know where he was. His wife suspected these men were not real policemen.

Mr. Saldivar-Munoz reentered the United States in about July or August 2008.[1] He traveled through Texas, Louisiana, Florida and Arkansas. He also went to California to visit his sister and eventually returned to Tulsa, Oklahoma. He did not explain how he traveled from place to place during this period of about two weeks. Mr. Saldivar-Munoz reunited with his wife and children in Tulsa and resumed his previous work as a journeyman plasterer. He did not report his illegal presence in the United States to any law-enforcement authority.

After Mr. Saldivar-Munoz left Mexico, the Zetas beat and kidnapped one of his brothers. The family paid $5,000 to gain his release, and the brother was no longer harassed. Later, a woman asked his father for a $5,000 "loan." Believing that this woman was associated with the Zetas, and not having the money, his father feared for his life and left the next day to live in a town forty miles away,

---

[1]     The date of Mr. Saldivar-Munoz's reentry is not clear from the record. His wife testified they were in Mexico for about seven months beginning in January 2008. But he told an immigration officer in May 2010 that he had last entered the United States about one year before. He later testified that he had been in this country for about a year and ten months at that time.

where the army is stationed. At the hearing, he was asked why he chose this new town:

> Q. We've been told that you went to the place that you live now because you think the Army can protect you. What do you think about that?
>
> A. Yes, the army is there.
>
> Q. Do they protect you?
>
> A. Yes, there's not that . . . pest like we call it.

R., Vol. 2 at 39.

On May 5, 2010, Mr. Saldivar-Munoz was arrested in Tulsa on an unrelated criminal charge. In the Tulsa County Jail he was identified as having been previously deported. He told the Sheriff he would be killed if he returned to Mexico. He also told Jonathon Pursley, who is both a Sheriff's Department employee and an immigration officer, that if he was sent back to Mexico the Zetas would take him out. According to Mr. Saldivar-Munoz, Officer Pursley laughed and responded, "[Y]eah, I know, we trained them." R., Vol. 2 at 106.

Mr. Saldivar-Munoz was later interviewed by Shawn Harriman, an Immigration Enforcement Agent, who recorded his responses on a written form. He signed the form, declaring that it correctly reflected his answers. When asked whether he had fear or concern about being returned to Mexico, he responded "no." *Id.*, Vol. 1 at 72. Agent Harriman explained that, if a person expresses fear about returning to his country, he will be given an opportunity to seek asylum in

the United States. He also described the numerous ways that Mr. Saldivar-Munoz could have contacted immigration authorities after he reentered the United States.

Mr. Saldivar-Munoz explained that he thought it was a waste of time to tell Agent Harriman about his fear of returning to Mexico, after Officer Pursley laughed at his statement about the Zetas. He also believed that asylum was only for rich people. He said he did not contact immigration authorities for help because they would only deport him back to Mexico, where his life was still in danger. As proof, he recounted that a person from his village in Mexico warned him in the Tulsa County Jail not to go back because he would be killed. He said he remained afraid of the Zetas in the United States because it is known that Oklahoma and Texas are also their turf. He admitted, however, that he had not been harmed or threatened by the Zetas since leaving Mexico.

When asked why he could not have fled to the same Mexican town to which his father had moved, he said he did not know that town and did not know how he could make a living there to support his family. He acknowledged there were other Mexican cities he could have gone to, but stated that he would have been forced to join a gang in those cities as well.

### District Court's Ruling

The district court ruled in favor of the government at the conclusion of the evidence. After listing the elements for establishing a defense of necessity, the court ruled that Mr. Saldivar-Munoz's evidence was insufficient to show that he

had no legal alternative to violating the law by reentering the United States. The court concluded:

> The father's ability to find other alternative living arrangements without leaving Mexico, and the defendant's own statements that the only thing that made the arrangements unavailable to him was the lack of job opportunities is evidence to this Court that the defendant had available to him other legal alternatives to violating the law, which he failed to explore. The defendant also testified that he did not seek assistance or safe harbor in other cities in Mexico because it was his belief that, in other Mexican cities, he would be approached by other gangs. However, this is only the . . . defendant's subjective belief, and the possibility that other gangs might have approached him had he fled to other cities is not sufficient to meet the imminent threat requirement of a necessity or duress defense[].

R., Vol. 2 at 156. Mr. Saldivar-Munoz filed a timely appeal of the district court's ruling.

### *Standard of Review*

We review a district court's denial of a defense of duress or necessity for an abuse of discretion. *See Portillo-Vega*, 478 F.3d at 1197 (duress); *United States v. Meraz-Valeta*, 26 F.3d 992, 995 (10th Cir. 1994) (necessity), *overruled on other grounds by United States v. Aguirre-Tello*, 353 F.3d 1199 (10th Cir. 2004); *United States v. Patton*, 451 F.3d 615, 637 (10th Cir. 2006) (concluding, despite inconsistency in previous decisions, abuse-of-discretion review was dictated by court's en banc decision). "An abuse of discretion occurs when the district court's decision is arbitrary, capricious, or whimsical, or results in a

manifestly unreasonable judgment." *United States v. Weidner*, 437 F.3d 1023, 1042 (10th Cir. 2006) (quotation omitted).

Mr. Saldivar-Munoz argues we should review de novo the district court's decision in this case, because the court's exclusion of evidence to support his duress or necessity defenses "goes to the heart of his constitutional rights to present relevant defense witnesses, compel testimony from witnesses, and testify on his own behalf." Aplt. Opening Br. at 10. But the case he relies on, *Rock v. Arkansas*, 483 U.S. 44 (1987), is inapposite. First, it does not address the applicable standard of review for a district court's exclusion of evidence in support of an affirmative defense. Nor does Mr. Saldivar-Munoz's case raise the constitutional question at issue in *Rock*.

In *Rock*, the Court held that a state's per se exclusion of post-hypnosis testimony, on the ground that it is always unreliable, violated the defendant's constitutional right to testify on her own behalf. *See id.* at 61-62. The application of the state's rule virtually prevented the defendant from testifying about the events that occurred on the day of the offense and severely limited her ability to testify about the offense itself. *See id.* at 57. The Court reasoned that "[w]holesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all post[-]hypnosis recollections." *Id.* at 61.

In this case the district court did not apply a per se rule that virtually prevented Mr. Saldivar-Munoz from testifying on his own behalf. Rather, it considered whether his evidence met the minimum standard as to each element of his proposed affirmative defenses. As the Court observed in *Rock*, "[T]he right to present relevant testimony is not without limitation. . . . But restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve." *Id.* at 55-56. Here, the district court applied the established rule that the jury need not be burdened with testimony supporting a defense if the evidence is insufficient on any one of the elements. *See United States v. Bailey*, 444 U.S. 394, 416-17 (1980) (holding defendants failed to introduce evidence sufficient to submit necessity and duress defenses to the jury); *see also Portillo-Vega*, 478 F.3d at 1200-01 (rejecting defendant's claim he had absolute right to have jury consider his defense). Thus, Mr. Saldivar-Munoz fails to show that de novo review is appropriate in this case.

### *Discussion*

"Necessity and duress are both affirmative defenses. While common law historically distinguished between the two, modern cases have blurred the distinction between duress and necessity." *Portillo-Vega*, 478 F.3d at 1197 n.4 (quotation and brackets omitted). We have stated somewhat different elements for these two defenses. In order to support a duress defense, a defendant must establish the following: "(1) an immediate threat of death or serious bodily

-10-

injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm." *Id.* at 1197 (quotation omitted).  Similarly,

> a defendant may successfully use a defense of necessity to excuse an otherwise illegal act if (1) there is no legal alternative to violating the law, (2) the harm to be prevented is imminent, and (3) a direct, causal relationship is reasonably anticipated to exist between defendant's action and the avoidance of harm.

*Meraz-Valeta*, 26 F.3d at 995.  "Under any definition of these defenses one principle remains constant:  if there was a reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm, the defenses will fail." *Bailey*, 444 U.S. at 410 (quotation omitted).

We need not determine whether Mr. Saldivar-Munoz presented sufficient evidence on each of the elements of a necessity or duress defense, because the district court did not abuse its discretion in concluding that he failed to show he had no reasonable, legal alternative to violating the law.  "Although some leeway needs be given to individuals responding to an emergency, they must still act in the most responsible manner available under the circumstances." *Al-Rekabi*, 454 F.3d at 1123.  Moreover, "all reasonable alternatives must be foreclosed." *Id.* And a defendant's subjective belief that he has no available legal alternatives is insufficient to submit the question to a jury.  *See Meraz-Valeta*, 26 F.3d at 995.

According to the evidence viewed in a light favorable to Mr. Saldivar-Munoz, illegal reentry into the United States was not his only option to escape an imminent threat of harm by the Zetas gang. He acknowledged that he could have traveled to other places in Mexico, including the town to which his father relocated after feeling threatened by the same gang. While he was more comfortable returning to the United States and believed he would have better job opportunities here, he failed to show it was impossible for him to move instead to another part of Mexico. *See Butler*, 485 F.3d at 577 (noting felon's discomfort with surrendering illegal firearm to police did not make doing so impossible).

Mr. Saldivar-Munoz's concern that he would be forced to join gangs in other Mexican cities also does not foreclose the option of relocating within Mexico. The question is whether he had reasonable, legal alternatives to escape imminent harm at the hands of the Zetas. We agree with the district court that the possibility some other gang in another Mexican city might threaten him with serious injury or death is insufficient to satisfy the imminent-threat requirement of a necessity or duress defense. *See id.* at 575 (evidence of threat must be "actually present, imminent and impending" (quotation omitted)).

Finally, Mr. Saldivar-Munoz asserts on appeal that the district court's conclusion that he was able to relocate within Mexico "assumes the availability of travel logistics and financial resources which is not established in the record." Aplt. Opening Br. at 13. This contention ignores his burden of proof. The

-12-

government was not required to disprove the elements of his defenses by presenting such evidence. *See Al-Rekabi*, 454 F.3d at 1122. Rather, he had the burden to establish the unavailability of legal alternatives to his illegal reentry into the United States.

Mr. Saldivar-Munoz failed to establish by a preponderance of the evidence an element of his proffered defenses of necessity or duress: that all of his legal alternatives for avoiding the imminent threat were foreclosed. "[T]his failure alone justified a rejection of the defense." *Portillo-Vega*, 478 F.3d at 1202; *see also United States v. Scott*, 901 F.2d 871, 873 (10th Cir. 1990) (trial court may disallow defense as a matter of law if evidence is lacking as to any element). Therefore, the district court did not err in granting the government's motion to exclude evidence in support of the defenses of necessity or duress.

The judgment of the district court is AFFIRMED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge