FILED
United States Court of Appeals
Tenth Circuit

August 24, 2018

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

NIKOLLE DENISE DIXON,

    Defendant - Appellant.

No. 17-7010

---

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 6:15-CR-00084-RAW-1)**

---

Whitney R. Mauldin, Assistant Public Defender (Julia L. O'Connell, Federal
Public Defender; Chance Cammack, Assistant Public Defender, with her on the
brief), Office of the Federal Public Defender, Northern and Eastern Districts of
Oklahoma, Tulsa, Oklahoma, for Defendant-Appellant.

Linda A. Epperley, Assistant United States Attorney (Douglas A. Horn, Acting
United States Attorney; Edward Snow, Assistant United States Attorney, with her
on the brief), Office of the United States Attorney, Eastern District of Oklahoma,
Muskogee, Oklahoma, for Plaintiff-Appellee.

---

Before **LUCERO**, **HOLMES**, and **McHUGH**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

Following a jury trial in the United States District Court for the Eastern District of Oklahoma, Defendant-Appellant Nikolle Denise Dixon was convicted on one count of embezzlement and theft from an Indian tribal organization, 18 U.S.C. § 1163.

Prior to trial, Ms. Dixon filed a Notice of Defense of duress, on the theory that she faced an imminent threat of sexual assault from her stepfather and that her Post Traumatic Stress Disorder ("PTSD") caused her to believe that no recourse to escape that assault was available except through theft. More specifically, Ms. Dixon asked the court to consider her theory of duress under the elements for that defense spelled out in Tenth Circuit Pattern Jury Instruction No. 1.36 ("Pattern Instruction 1.36"). In response, the government filed a motion *in limine*, asking the court to reject the defense and to exclude all evidence and testimony relevant to the defense. The court granted the government's motion.

To ensure preservation of her objection, shortly before trial, Ms. Dixon's counsel offered Pattern Instruction 1.36 for the court's possible presentation to the jury and filed a written proffer of the expert testimony that would be elicited in support of her duress defense. At trial, however, the court maintained its previous ruling, which rejected the defense, and the jury convicted Ms. Dixon.

On appeal, Ms. Dixon asks us to reverse the district court's decision to reject her duress defense and, more specifically, her related request for a jury

2

instruction. Ms. Dixon contends that her duress defense was viable because her actions were reasonable when viewed through the lens of her history of sexual abuse and her diagnosis of PTSD. Exercising jurisdiction under 28 U.S.C. § 1291, we reject this argument and **affirm** the district court's judgment.

## I

## A

The events relating to Ms. Dixon's conviction for embezzlement occurred in 2013 and 2014, but the events underlying her claimed defense of duress are more historically rooted.

## 1

Ms. Dixon was employed as a cashier at the Pocola Travel Plaza ("Travel Plaza"), a convenience store owned by the Choctaw Nation of Oklahoma. On January 6, 2014, a Choctaw Tribal officer was dispatched to speak with the Travel Plaza Director, who informed the officer that Ms. Dixon was voiding out cash sales and pocketing the sales at the end of her shifts. A review of three days of surveillance video showed that Ms. Dixon had voided a total of $1,536.81 in sales transactions. A more longitudinal review revealed that Ms. Dixon voided over 845 transactions totaling $16,937.83 during the period between October 20, 2013, and January 4, 2014. Investigators were not able to determine how much was taken prior to October 2013, due to a lack of transaction journals before that time.

3

Ms. Dixon admitted to taking the money at a February 21, 2014, interview with an investigator for the Choctaw Tribal Police. In the interview, Ms. Dixon indicated that she felt like she had to steal the money because of the financial situation in her household.

At the time of the theft, Ms. Dixon was twenty-one years old. She lived at home and was a caretaker for her disabled mother. Ms. Dixon attended college during this time but struggled because of severe emotional issues. Those emotional issues accrued during childhood and allegedly were directly related to her stepfather's occupancy of the home that Ms. Dixon shared with her mother; the stepfather began living with them when Ms. Dixon was twelve years old. During his time in the home, Ms. Dixon's stepfather allegedly sexually assaulted her on a near-daily basis. Even after her stepfather moved out of the house, he allegedly continued to abuse her, albeit less frequently. Ms. Dixon never reported the abuse to her mother or the authorities prior to her indictment, in large part due to threats that her stepfather allegedly made against the lives of Ms. Dixon and her mother.[1]

---

[1] In her affidavit, Ms. Dixon states that:

I never reported the abuse to my mother or authorities due to threats made by [my stepfather]. No one had ever protected me and I did not believe that any one could and [my stepfather] threatened to kill my mother if I told. I did not believe that the police could prevent [my stepfather] from hurting us and I did

(continued...)

4

Shortly before Ms. Dixon began to steal from the Travel Plaza, her stepfather cut off financial support to the family and refused to assist financially unless he was allowed to move back into the home. Ms. Dixon's mother wanted the stepfather to return in order to alleviate their financial hardship. Ms. Dixon was unable to explain her fear of her stepfather's return to her mother. But this fear allegedly impelled Ms. Dixon to begin embezzling from the Travel Plaza and giving her mother the money to pay the bills, in the hope of keeping her stepfather at bay. Ms. Dixon states that she did so, "knowing that if my mother had enough money, she wouldn't let [her stepfather] move back into the house." R., Supp. Vol. I, at 132 (Aff. of Nikolle Dixon).

**2**

Ms. Dixon was indicted by a grand jury for her embezzlement offense on December 9, 2015. Thereafter, she began receiving psychological therapy from Dr. Patricia Nation, a licensed counselor, sociologist, and criminologist employed by the Choctaw Nation. Dr. Nation diagnosed Ms. Dixon with PTSD and Dissociative Disorder. Dr. Nation's evaluation found that, consistent with PTSD's clinical criteria, Ms. Dixon was exposed to traumatic events (i.e., the sexual abuse and threats of extreme violence against her mother if she reported

---

[1](...continued)
    not know if I would even be believed.

R., Supp. Vol. I, at 132 (Aff. of Nikolle Dixon).

5

the abuse); consequently, she experienced flashbacks, dissociation, distressing memories and the need to avoid them, persistent and exaggerated negative feelings, and feelings of detachment from others. Dr. Nation found that:

> Dixon was sexually abused for many years resulting in her mental health diagnoses, as a result she believed there to be no hope, no help coming, and that she had no power over her body or her life . . . . Dixon saw no alternative to her actions[,] and by taking the money, she was able to secure some momentary peace and safety.

R., Supp. Vol. I, at 27 (Aff. of Patricia Nation, dated Aug. 26, 2016). Dr. Nation concluded that Ms. Dixon's diagnoses directly stemmed from the long-term sexual abuse she suffered at the hands of her stepfather. As a result of the counseling with Dr. Nation, Ms. Dixon reported the abuse (apparently to law enforcement), but her stepfather died before any criminal action against him could be initiated.

Dr. Curtis Grundy also corroborated Dr. Nation's diagnosis of PTSD and Dissociative Disorder. After conducting a forensic psychological examination of Ms. Dixon, Dr. Grundy agreed that Ms. Dixon's results were "strongly characteristic of an individual with a genuine disorder who is making no efforts to overstate her symptoms." *Id.* at 127 (Psych. Rpt. of Curtis Grundy, dated May 20, 2016). Specifically, Dr. Grundy found that "Ms. Dixon described experiencing increased symptoms of [PTSD] and depression, explaining that she could not cope with her stepfather returning to live with her and her mother . . . . [T]he

6

circumstances of her previous trauma and symptomatology that developed in response to her trauma impaired her capacity to control her behavior." *Id.* at 129–30.

**B**

On June 20, 2016, Ms. Dixon filed a Notice of Defense of duress. Therein, Ms. Dixon asked the court to consider her theory of duress under the elements of that defense spelled out in Pattern Instruction 1.36. Specifically, Ms. Dixon averred that she faced an imminent threat of sexual assault from her stepfather and believed that she had no recourse to escape that assault other than by stealing the funds at issue. In support of her proposed defense, Ms. Dixon sought to admit expert testimony tending to show that she suffered from PTSD and that her perception of duress was reasonable when viewed in light of that diagnosis. The Notice of Defense included excerpts from the diagnoses and reports made by Dr. Nation and Dr. Grundy; it predicted that the two medical professionals would "discuss what PTSD is, the methodology commonly used in diagnosing PTSD and the affect that the disorder may have on [a] person's perception of a threat." R., Vol. II, Doc. 46, at 33–43 (Notice of Defense, dated June 20, 2016). The government filed an opposing motion *in limine* requesting that the trial court deny the defense altogether and urging the court to exclude all evidence and testimony relevant to the defense. The court granted the government's motion.

In particular, in a written order issued on August 11, 2016, the district court concluded that Ms. Dixon failed to establish any of the requisite duress elements—identified in Pattern Instruction 1.36—by a preponderance of the evidence. Consequently, it rejected Ms. Dixon's duress defense and excluded purported duress-related testimony regarding Ms. Dixon's history of sexual abuse, as well as her experts' testimony as to the effects of PTSD on Ms. Dixon's ability to perceive alternative options.

To ensure preservation of her objection, shortly before the trial, Ms. Dixon formally submitted to the court a copy of Pattern Instruction 1.36 and requested that the jury receive it. Further, she filed a written proffer of the evidence she would introduce if her duress defense were allowed. The parties proceeded to a one-day jury trial on August 30, 2016. In the trial, the court adhered to its ruling on Ms. Dixon's duress defense, and the jury convicted her on the embezzlement charge. The present appeal ensued.

## II

On appeal, Ms. Dixon contends that the district court wrongly denied her a jury instruction as to duress because she adduced sufficient evidence to put the defense at issue. Resolving her argument under the legal framework that Ms. Dixon advanced before the district court and on appeal—based on Pattern Instruction 1.36—we reject her challenge.

## A

8

In reviewing whether a proffer was sufficient to establish an affirmative defense, we "respect the trial judge's role as gatekeeper" and review "the denial of a duress defense for abuse of discretion." *United States v. Portillo-Vega*, 478 F.3d 1194, 1197 (10th Cir. 2007) (quotation omitted); *accord United States v. Seward*, 687 F.2d 1270, 1276 (10th Cir. 1982) (en banc). Under this standard, we will reverse the district court only "if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281, 1289 (10th Cir. 2005) (quoting *F.D.I.C. v. United Pac. Ins. Co.*, 152 F.3d 1266, 1272 (10th Cir. 1998)). And the question of "[w]hether there is sufficient evidence to constitute a triable issue of [the defense] is a question of law." *United States v. Gutierrez-Gonzalez*, 184 F.3d 1160, 1164 (10th Cir. 1999) (discussing the entrapment defense).[2]

_____

[2] Some of our cases have expressed a degree of uncertainty as to the applicable standard of review. For example, in *United States v. Patton*, 451 F.3d 615, 637 (10th Cir. 2006), we reviewed the denial of the defendant's necessity defense for abuse of discretion, with the caveat that our caselaw has "not always been consistent about the standard of review for a district court's denial of a requested defense instruction." *Id.* We also observed that "other circuits use *de novo* review for this essentially legal question." *Id.* However, even under a deferential abuse-of-discretion standard, in the instructional context, erroneous conclusions of law are *effectively* subject to de novo review in any event. Thus, "[l]ittle turns . . . on whether we label review [of a court's refusal to give a particular instruction] abuse of discretion or *de novo*, for an abuse of discretion standard does not mean that a mistake of law is beyond appellate correction . . . . The abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *United States v. Johnston*, 146 F.3d 785, 792 (10th Cir. 1998) (quoting *Koon v. United States*, 518 U.S. 81, 100

(continued...)

**B**

The Tenth Circuit recognizes the affirmative defense of duress. *See United States v. Patton*, 451 F.3d 615, 637 (10th Cir. 2006). More specifically, according to Pattern Instruction 1.36—upon which Ms. Dixon has based her argument—"coercion or duress" consists of three elements:

1.    [T]he defendant was under an unlawful and present, imminent and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury to himself [or a family member, or others];

2.    [T]he defendant had no reasonable, legal alternative to violating the law, that he had no chance both to refuse to do the criminal act and also to avoid the harm; and

3.    [A] direct causal relationship could have been reasonably anticipated between engaging in the criminal action and avoiding the threatened harm.

Tenth Cir. Crim. Pattern Jury Inst. No. 1.36 [hereinafter Pattern Inst. 1.36] (second alteration in original).[3]

---

[2](...continued)
(1996)). This is because "[a] district court by definition abuses its discretion when it makes an error of law." *Koon*, 518 U.S. at 100 (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

[3]    Our pattern instruction for duress includes elements that are consistent with the elements for the defenses of "justification and necessity," as set out in our decision in *United States v. Virgil*, 743 F.2d 751, 755 (10th Cir. 1984). "While common law historically distinguished between the two, modern cases have 'blur[red] the distinction between duress and necessity.'" *Portillo-Vega*, 478 F.3d at 1197 n.4 (quoting *United States v. Bailey*, 444 U.S. 394, 409–10 (1980)). And we have "used the terms duress, necessity, and justification

(continued...)

As Ms. Dixon acknowledges, the defendant bears the burden of proving all three elements of a duress defense by a preponderance of the evidence. *See United States v. Beckstrom*, 647 F.3d 1012, 1016 (10th Cir. 2011); *see Portillo-Vega,* 478 F.3d at 1197; *cf. Dixon v. United States*, 548 U.S. 1, 17 (2006) ("In the context of the firearms offenses at issue—as will usually be the case, given the long-established common-law rule—we presume that Congress intended the petitioner to bear the burden of proving the defense of duress by a preponderance of the evidence."). "As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988); *accord United States v. Randall,* 661 F.3d 1291, 1295–96 (10th Cir. 2011). However, the right to present an affirmative defense is not absolute. *See Portillo-Vega,* 478 F.3d at 1200–01 (affirming the denial of a duress defense).

A district court must refuse to issue a duress-defense instruction when the

---

[3](...continued)
interchangeably." *United States v. Butler*, 485 F.3d 569, 572 n.1 (10th Cir. 2007). We also have opined that duress and necessity are "'two sides of the same coin,' being animated by similar policies and principles." *United States v. Cornelius*, 696 F.3d 1307, 1323 n.8 (10th Cir. 2012) (quoting *United States v. Al-Rekabi*, 454 F.3d 1113, 1123 n.8 (10th Cir. 2006)). Because the same essential elements are at issue in the defenses of necessity and duress, we break no new ground by referring to caselaw on the necessity defense for guidance in our assessment of the merits of Ms. Dixon's duress defense. *See, e.g., Portillo-Vega*, 478 F.3d at 1200 (holding that *Bailey*, which dealt with the defense of necessity, "is . . . central to a discussion of the duress defense").

11

defendant fails to make "a threshold showing" of duress sufficient to place the defense in issue. *United States v. Scott*, 901 F.2d 871, 873 (10th Cir. 1990). Far from usurping the prerogatives of the jury, *see id.*, a district court's refusal to issue a requested instruction in such circumstances is an "example of the proper exercise of the trial judge's role as gatekeeper." *United States v. Butler*, 485 F.3d 569, 573 (10th Cir. 2007). To open the gate to the defense, "it is essential that the testimony given or proffered meet a minimum standard as to *each element* of the defense so that, if a jury finds it to be true, it would support an affirmative defense." *United States v. Bailey*, 444 U.S. 394, 415 (1980) (emphasis added).

Thus, Ms. Dixon was entitled to have the court present a duress defense to the jury if she produced sufficient evidence that would permit the jury to find in her favor by a preponderance on each element of the defense. *See Portillo-Vega*, 478 F.3d at 1200 ("The issue is whether Portillo-Vega carried his burden of establishing, by a preponderance of the evidence, each element of a duress defense."); *accord United States v. Cornelius*, 696 F.3d 1307, 1323 (10th Cir. 2012) ("To have been entitled to [a duress] instruction, Cornelius must have produced or at least proffered evidence that, viewed in the light most favorable to Cornelius, demonstrated under a preponderance standard each element of the requested affirmative defense.").[4]

---

[4] Ms. Dixon cites to our decision in *United States v. Haney* in
(continued...)

12

suggesting that an instruction may be granted on a showing of less than a preponderance of the evidence. 318 F.3d 1161, 1163 (10th Cir. 2003) (en banc) (holding that "[a] criminal defendant is entitled to an instruction on his theory of defense provided that theory is supported by *some evidence* and the law" (emphasis added)). However, we reject this reading of *Haney*. That case does not stand for the proposition that the mere proffer of "some evidence" at all would suffice to entitle a defendant to a requested jury instruction. Indeed, *Haney* derives from a line of cases that traces back to our decision in *Beck v. United States*, 305 F.2d 595 (10th Cir. 1962). *See Haney*, 318 F.3d at 1163 (citing, in support of a defendant's entitlement to a theory-of-defense instruction, *United States v. Scafe*, 822 F.2d 928, 932 (10th Cir. 1987), which cites on this subject *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985), which cites in turn, *inter alia*, *Beck*, 305 F.2d at 599). And *Beck* articulates—albeit in slightly different terms—the same sufficiency standard that the Supreme Court set out in *Bailey* and *Mathews*. *See Beck*, 305 F.2d at 599. Specifically, *Beck* held that "a defendant . . . is entitled to adequate jury instructions on his theory of defense, *provided, however, there is evidence before the jury to reasonably support such theory*." *Id.* (emphasis added). And, under established practice, there would be sufficient evidence before the jury to support a theory of defense, as *Beck* requires, only if the preponderance-of-the-evidence standard was met. *See, e.g.*, *Beckstrom*, 647 F.3d at 1016; *Portillo-Vega,* 478 F.3d at 1197; *see also Dixon*, 548 U.S. at 13, 17 (discussing "the long-established common-law rule" that "required the defendant to bear the burden of proving the existence of duress" by a preponderance). If *Haney* had intended to take the remarkable step of departing from this well-established standard—embodied in *Beck*—we think it would have offered at least a few words signaling so, but *Haney* is mute on the subject. That is because, in our view, *Haney* intended no such thing.

Furthermore, quite apart from *Beck*, we cannot conclude that *Haney* holds that a defendant may carry her burden of proof to secure a theory-of-defense instruction by less than a preponderance of the evidence. Specifically, this follows because *Haney*'s reference to "some evidence" cannot be isolated from the larger body of jury-instruction jurisprudence. As the Supreme Court emphasized in *Bailey*, the defendant's proffer in support of a theory of defense must meet a "minimum threshold" of proof before a theory-of-defense instruction can be put before the jury. *Bailey*, 444 U.S. at 414. And there is no room for guesswork as to when that minimum threshold is met, because the Court has held

(continued...)

13

In determining whether the evidence was sufficient to raise a jury issue, we review the evidence in the light most favorable to the defendant. *See Butler*, 485 F.3d at 571–572; *see also United States v. Yazzie,* 188 F.3d 1178, 1185 (10th Cir. 1999) (noting that "we must give full credence to defendant's testimony" (quoting *United States v. Williams*, 791 F.2d 1383, 1388 (9th Cir. 1986))). However, if the evidence is insufficient as to even one element, "the trial court and jury need not be burdened with testimony supporting other elements of the defense." *Bailey*, 444 U.S. at 416; *see also Scott*, 901 F.2d at 873 (noting that "[i]f the evidence is

---

[4](...continued)
at least twice that the minimum quantum of evidence required is that which would be "sufficient for a reasonable jury to find in his favor." *Mathews*, 485 U.S. at 63; *see also Bailey*, 444 U.S. at 415 (requiring, in the context of a necessity defense, "a minimum standard as to each element of the defense to that, if a jury finds it to be true, it would support an affirmative defense"). And that minimum quantum, as Ms. Dixon acknowledges as to the duress defense, is a preponderance. We do not regard *Haney* as holding otherwise. Indeed, even where we have cited to *Haney* in discussing a defendant's entitlement *vel non* to an instruction regarding a defense theory, we have underscored that a defendant must point to a sufficient factual basis to support such an instruction, and "whether the evidence was sufficient to warrant a jury instruction" is determined by whether the defendant may prove every "element of an affirmative defense" "by a preponderance of the evidence." *See United States v. Sparks*, 791 F.3d 1188, 1193 (10th Cir. 2015).

In sum, based on the foregoing, we reject Ms. Dixon's invitation to take *Haney*'s "some evidence" language out of context. Instead, as relevant here, we underscore our holding in *Portillo-Vega* that the "issue is whether [the defendant] carried his burden of establishing, by a preponderance of the evidence, each element of a duress defense." 478 F.3d at 1200.

14

lacking as to any element of the coercion [i.e., duress] defense the trial court may properly disallow the defense as a matter of law and refuse to instruct the jury as to coercion [i.e., duress]").

## C

Based on the record evidence, we conclude that Ms. Dixon failed to make out the threshold showing to present a duress defense to the jury. We are content to resolve this case by determining that Ms. Dixon failed to establish the second element of her duress defense—*viz.*, Ms. Dixon failed to show that she had no reasonable, legal alternative to violating the law. "[T]his failure alone justified a rejection of the defense" of duress. *Portillo-Vega*, 478 F.3d at 1202.

The *sine qua non* of any justification defense is a lack of a reasonable, lawful alternative. *See Bailey*, 444 U.S. at 410 (holding, in the context of necessity, that "if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,' the defense[] will fail" (quoting W. LaFave & A. Scott, HANDBOOK ON CRIMINAL LAW § 28, at 379 (1972))); *see also Shannon v. United States*, 76 F.2d 490, 493 (10th Cir. 1935) ("One who has full opportunity to avoid the act without danger of that kind [i.e., of 'death or serious bodily injury'] cannot invoke the doctrine of coercion [i.e., duress] and is not entitled to an instruction submitting that question to the jury."). "Although some leeway needs be given to individuals responding to an emergency, they must still act in the most responsible manner

15

available under the circumstances." *United States v. Al-Rekabi*, 454 F.3d 1113, 1123 (10th Cir. 2006) (discussing a necessity defense). Moreover, "all reasonable alternatives must be foreclosed." *Id.* Under Ms. Dixon's offer of proof, it is clear that there were courses of action open to her other than embezzlement.

For one, Ms. Dixon could have reported the abuse to the police. Indeed, "[t]he ability to contact law enforcement will generally constitute a reasonable alternative to illegal activity." *Beckstrom*, 647 F.3d at 1016. Ms. Dixon argues to the contrary, averring in her affidavit that she "did not believe that the police could prevent [her stepfather] from hurting us and I did not know if I would even be believed." R., Supp. Vol. I, at 132. But this is not good enough. *See, e.g.*, *United States v. Fraser*, 647 F.3d 1242, 1246 (10th Cir. 2011) ("Before breaking the law could have possibly become a reasonable course of action, Mr. Fraser had to try to comply with it first. A general distrust of legal authorities isn't enough to excuse the failure to do so.").

More specifically, Ms. Dixon needed to show more than just a subjective belief that going to the police would be futile: she had to put forth "specific reasons to doubt that the law enforcement alternative was viable." *Beckstrom*, 647 F.3d at 1017; *see also United States v. Gonzalez*, 407 F.3d 118, 122 (2d Cir. 2005) ("Gonzalez asserted that she did not seek police intervention because she believed the authorities 'would not listen to her' about Padua's threats and because she was reluctant to 'giv[e] evidence against her husband.' Gonzalez's

16

subjective belief that going to the police would have been futile is insufficient to demonstrate that she had no reasonable alternative but to violate the law." (alteration in original)).

Indeed, mere allegations that "police would have been ineffective or unwilling to protect [Ms. Dixon] . . . . fall well short of satisfying a defendant's burden." *Beckstrom*, 647 F.3d at 1017*; see Butler*, 485 F.3d at 577 (noting, in reference to a necessity defense, that "distrust [of police] does not eliminate . . . disclosure of the circumstances to the police as a reasonable legal alternative"); *Scott*, 901 F.2d at 874 (noting that "Scott's failure to avail himself of the readily accessible alternative of contacting law enforcement officials is persuasive evidence of the hollow nature of Scott's claimed coercion [i.e., duress] defense").

Yet, even assuming that Ms. Dixon could not report the abuse to the police because she feared retribution from her stepfather, she has offered no evidence that *other* alternatives were unavailable to her. As the district court observed,

> reporting the abuse was *only one* alternative. She could have left the home. She could have sought out a family member to move in with, even if only temporarily. Also, as the Government argues, she could have sought out friends or coworkers to move in with or she could have sought housing assistance through the tribe. She could have attempted to acquire a loan . . . . [S]he *had* reasonable alternatives available to her.

R., Vol. I, at 99–100 (emphases added). In other words, Ms. Dixon could have done any number of things. And, significantly, she could have done them at any time during the three months in which she was embezzling. *See Butler*, 485 F.3d

17

at 576 ("[U]sually, when a defendant's conduct spans a period of time, there are other alternatives to the illegal conduct." (citing *United States v. Newcomb*, 6 F.3d 1129, 1137 (6th Cir. 1993))); *see also Beckstrom*, 647 F.3d at 1017 (noting that defendant did not claim that his drug-trafficking accomplice, who had threatened him with unlawful violence, "prevented him from reaching out to police during [an] entire two-week span," and "[t]o accept [the defendant's] argument would allow him to seek a license to sell methamphetamine over a lengthy period of time based on nothing more than conclusory allegations that police would be unable or unwilling to help him"); 2 Paul H. Robinson, CRIMINAL LAW DEFENSES § 177(h), Westlaw (database updated June 2018) ("Once a defendant has options other than approaching law enforcement specifically, and the time in which to pursue those options, it is no longer objectively reasonable not to do so."). Ms. Dixon, however, did not pursue any of those options, and further, has yet to offer any compelling argument as to why we should believe those alternatives were unavailable.

Accordingly, we conclude that Ms. Dixon failed to prove that she had no reasonable, legal alternatives to embezzling. This was a sufficient basis for the district court to rebuff her duress defense. *See, e.g.*, *Portillo-Vega*, 478 F.3d at 1202.

**D**

18

To be sure, Ms. Dixon contests such an outcome and argues that we should assess her actions from the perspective of a reasonable person in the same circumstances as she confronted—that is, through the lens of a "reasonable person of ordinary firmness who [has been] abused for years" and who now suffers from PTSD. Aplt.'s Opening Br. at 15. According to Ms. Dixon, such an approach would give added texture to the first two elements of duress. Specifically, the sexual abuse and resultant PTSD "may [have] affect[ed] the objective reasonableness of [her] fear," *id.* at 14, and "altered [her] psychology . . . in [such] a way that demanded her to engage in an unlawful act to prevent" what—through years of conditioning—she perceived to be an "omnipresent," "certain harm." *Id.* at 11; Aplt.'s Reply Br. at 7.

**1**

We reject Ms. Dixon's argument because it finds no home under the legal framework that Ms. Dixon herself has advanced as the proper basis for her duress defense—that is, Pattern Instruction 1.36. The plain text of that instruction makes clear that the legal propriety of a defendant's assessment of, and response to, the circumstances that allegedly have subjected her to duress is determined by applying an objective lens—that is, a defendant's subjective beliefs or perspectives are only relevant insofar as they are objectively reasonable. The pattern instruction requires "a well-grounded apprehension," a lack of a

19

"reasonable, legal alternative," and a direct causal link that could have been "reasonably anticipated."

This language makes clear that a particular defendant's subjective beliefs or perspectives are not controlling; they must be objectively reasonable. *See Butler*, 485 F.3d at 577 (noting that the defendant's past experiences "may well have led him to be hesitant in trusting law enforcement to keep him and his family safe, but such distrust does not eliminate prompt relinquishment of the gun and disclosure of the circumstances to the police as a *reasonable legal alternative*" (emphasis added) (footnote omitted)); *United States v. Meraz-Valeta*, 26 F.3d 992, 995 (10th Cir. 1994) (holding, as to an asserted necessity defense, which required the defendant to establish that "there is no legal alternative to violating the law," that a "defendant's subjective belief as to available legal alternatives is not determinative"), *overruled on other grounds by United States v. Aguirre-Tello*, 353 F.3d 1199 (10th Cir. 2004) (en banc); *United States v. Saldivar-Munoz*, 439 F. App'x 730, 735 (10th Cir. 2011) (unpublished) ("[A] defendant's subjective belief that he has no available legal alternatives is insufficient to submit the question to a jury."); *see also United States v. Willis*, 38 F.3d 170, 175 (5th Cir. 1994) (noting that the "requirements" of the duress defense evince an "objective formulation," more specifically, they "are addressed to the impact of a threat on a reasonable person" in that "[t]he fear of death or serious bodily injury

20

must be 'well-grounded[]'" and "[t]here must be no 'reasonable' alternative to violating the law."); *accord United States v. Dixon*, 413 F.3d 520, 523 (5th Cir. 2005) ("[T]he duress defense requires an objective inquiry into whether a defendant's conduct, although illegal, represented her only reasonable alternative to serious bodily injury or death."), *aff'd on other grounds*, 548 U.S. 1 (2006). *Compare* 2 Kevin F. O'Malley, et al., FED. JURY PRAC. & INSTR. § 35:06, Westlaw (6th ed. database updated Aug. 2018)) (noting that the Ninth Circuit's Jury Instructions Committee that fashioned the duress-defense instruction "interprets 'well founded' and 'well grounded' to be an objective test"), *with* NINTH CIR. MODEL CRIM. JURY INSTR. § 6.6 & cmt. (2010 ed., last updated June 2018) (instructing that the necessity defense requires the defendant to prove, *inter alia*, that "there were no other legal alternatives to violating the law," and noting the Committee's belief that this defense should be "analyzed through an objective framework").

Notably, at least the most salient federal decisions that have demonstrated a receptivity to arguments akin to Ms. Dixon's have relied in significant part on the linguistic formulation of the duress defense adopted by the Model Penal Code ("MPC"), which frames the inquiry as whether a defendant "was coerced" to commit the crime by "the use of, or a threat to use, unlawful force against his person or the person of another, that a person of reasonable firmness *in his*

*situation* would have been unable to resist." MODEL PENAL CODE AND COMMENTARIES § 2.09(1), at 367 (Am. Law Inst. 1985) (emphasis added) (bold font omitted) [hereinafter MPC]; *see United States v. Nwoye* ("*Nwoye II*"), 824 F.3d 1129, 1137 (D.C. Cir. 2016) ("Reasonableness—under both the imminence prong and the no-reasonable-alternative prong—is not assessed in the abstract. Rather, any assessment of the reasonableness of a defendant's actions must take into account the defendant's 'particular circumstances,' at least to a certain extent . . . . Examination of the particulars of the duress defense shows that expert testimony on battered woman syndrome can indeed identify relevant aspects of a battered woman's particular circumstances." (citations omitted, including to MPC § 2.09) (quoting *United States v. Nwoye* ("*Nwoye I*"), 663 F.3d 460, 464 (D.C. Cir. 2011))); *see also United States v. Johnson*, 956 F.2d 894, 898, 900 (9th Cir. 1992) (discussing, on the one hand, the objective features of the MPC's duress-defense formulation and the idea that under that formulation "a purely subjective element [] cannot be taken into account in determining criminal liability," and, on the other hand, noting that the MPC's "commentary expands the defense" in a way that may make evidence of Battered Woman's Syndrome ("BWS") relevant), *superseded by regulation on other grounds as recognized by U.S. v. Martinez-Martinez*, 369 F.3d 1076 (9th Cir. 2004); *United States v. Marenghi*, 893 F. Supp. 85, 94 (D. Me. 1995) ("This Court is reluctant to . . .

22

establish[] a per se rule of excluding expert testimony that may be characterized as addressing battered woman syndrome [in cases where a defendant asserts a duress defense]. Part of the complexity of the issue is that the distinction between subjective and objective evidence is not as clear as the Government asserts here." (citing MPC § 2.09)).

However, the linguistic formulation of Pattern Instruction 1.36 is patently different from the MPC's and, perhaps most notably, does not include the MPC's "in his situation" language, which appears to have been taken by the aforementioned courts as an invitation to consider, in assessing the propriety of an asserted duress defense, evidence regarding a psychological disorder that even the government here acknowledges is "similar" to PTSD, Aplee.'s Resp. Br. at 25—that is, BWS. Consequently, given this linguistic difference, we do not read our Pattern Instruction 1.36 as offering the same or similar invitation to consider evidence relating to conditions like PTSD. And, more specifically, we conclude that under our pattern instruction the legal propriety of a defendant's assessment of, and response to, the circumstances that allegedly have subjected her to duress is determined by applying an objective lens—a lens that is closed to Ms. Dixon's evidence that would ostensibly demonstrate the *subjectively distorting* impact of PTSD on her ability to reasonably perceive the threat of harm and legal alternatives to avoid it. Under our pattern instruction, the touchstone is still what

23

is objectively reasonable—not what is reasonable only through the PTSD-distorted lens of Ms. Dixon.

This is not to say that the linguistic formulation of Pattern Instruction 1.36 is purely objective. The instruction's focus is on the perceptions and actions of "the defendant," not on those of some hypothetical reasonable person. *Compare Objective Standard*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("A legal standard that is based on conduct and perceptions external to a particular person. [] In tort law, for example, the reasonable-person standard is considered an objective standard because it does not require a determination of what the defendant was thinking."), *and* Bryan A. Garner, A DICTIONARY OF MODERN LEGAL USAGE 737 (2d ed. 1995) (noting that "[t]he reasonable person" is "a hypothetical legal standard"), *with* Robinson, *supra*, § 177(f) (questioning the advisability of a purely objective statutory standard for duress that would permit an excuse so long as a reasonable person would be coerced by the threatened harm, and noting that ordinarily "the excusing condition of the duress defense requires that at the time of the conduct constituting the offense the actor suffer an impairment of *his* ability to control his conduct such that he cannot properly be held accountable for it," that is "*the actor* must in fact suffer the relevant disability" (first emphasis added)), *and id.* §161(b)(5) ("What is critical is whether the disability in fact causes the necessary loss of control of the conduct

24

that constitutes the offense."). The formulation of the pattern instruction does demand, however, that those perceptions and actions be reasonable. And, because the focus is on a particular defendant (rather than a hypothetical one), certain specific circumstances confronting that particular defendant may influence the factfinder's evaluation of whether her conduct is reasonable. For example, as salient here, if the particular defendant is a quadriplegic, ordinarily it would not be a "reasonable, legal alternative" for that defendant to physically run away from an "unlawful and present, imminent and impending threat . . . of death or serious bodily injury" that was presented by an able-bodied assailant, Pattern Inst. 1.36—but it might be reasonable for a defendant not afflicted by quadriplegia to do so.

The fact, however, that the linguistic formulation of Pattern Instruction 1.36 contemplates consideration of whether the objective reasonableness of a particular defendant's conduct has been materially influenced by external, concrete factors unique to her does not mean that this language similarly contemplates that the factfinder should take into account whether the objective reasonableness of the defendant's conduct has been influenced by non-tangible psychological conditions that ostensibly alter the defendant's subjective beliefs or perceptions. Indeed, even some language in the seemingly less restrictive MPC envisions that, while externally verifiable circumstances may be factored into the

25

duress calculus, circumstances that are not so verifiable may not be. *See* MPC §
2.09, cmt. 3, at 375 (noting that "account is taken of the actor's 'situation,'. . . .
[s]tark, *tangible* factors that differentiate the actor from another, like his size,
strength, age or health, would be considered in making the exculpatory
judgment," but "[m]atters of temperament would not" (emphasis added)); *see also*
*Marx v. State*, 724 S.W.2d 456, 459 (Ark. 1987) ("[I]f the actor were blind or if
he had just suffered a blow or experienced a heart attack, these would certainly be
facts to be considered, but heredity, intelligence or temperament of the actor
would not.").

It is helpful in understanding this distinction to note that the objective
lens—which is embodied in the language of Pattern Instruction 1.36—reflects an
historical view that the characteristics of this particular "excuse" for criminal
conduct (i.e., the duress defense) call for the imposition of clearly defined and
concrete boundaries to distinguish between those defendants who are worthy of
exculpation and all others. *See* 2 Robinson, *supra*, § 177(c)(3) ("It may seem that
duress is unique among excuses in requiring that the threat causing the disability
meet an objective standard . . . . [T]he special objective restriction on the cause
of the disability in duress is necessary to ensure conformity with a characteristic
that is inherent in the other excuses. By requiring that an actor be intoxicated or
insane, those excuses automatically ensure that an excuse will be available only

26

for defendants with a demonstrable defect that distinguishes them from the general population. In contrast, the bare, unqualified disability in duress, a state of coercion, carries no such assurance; everyone is subject to pressures, demands, and urges every day."); *id.* § 161(b)(1) ("[W]here an actor engages in criminal conduct with the same knowledge and appreciation of its nature, consequences, and wrongfulness or criminality as a normal person, yet claims an impairment of control, rather than a gross condition of involuntary conduct, then society is generally unwilling to excuse unless there is a clear, confirmable, almost compelling disability."); *cf. Al-Rekabi*, 454 F.3d at 1124 ("A claim of necessity may be little more than an *ex-post* attempt by defense counsel to exculpate a client.  Such a claim is easily made and so must be factually justified.  'Vague and necessarily self-serving statements of defendants or witnesses as to . . . ambiguous conduct simply do not support a finding of this element of the defense.'  Demanding a prompt and appropriate remedial response to the claimed 'necessity' is a legitimate precondition to recognizing the defense and is also a useful tool in measuring the bona fides of a claimant." (citation omitted) (quoting *Bailey*, 444 U.S. at 415)).

In sum, the analytical framework established by our Pattern Instruction 1.36—which Ms. Dixon herself has advanced before the district court and on appeal—makes clear that the legal propriety of a defendant's assessment of, and

27

response to, the circumstances that allegedly have subjected her to duress is determined by applying an objective lens. That lens is closed to Ms. Dixon's evidence that would ostensibly demonstrate the *subjectively distorting* impact of PTSD on her ability to reasonably perceive the threat of harm and legal alternatives to avoid it. As relevant here, the guidepost of our pattern instruction is not what is reasonable only through the PTSD-distorted lens of Ms. Dixon but, rather, what is objectively reasonable. And, as demonstrated in Part II.C, *supra*, the district court did not err in finding that Ms. Dixon's duress defense was legally insufficient under the analytical framework of our pattern instruction because she had reasonable, legal alternatives to violating the law.

### 2

We recognize that on appeal Ms. Dixon appears to tacitly ask us to apply a different rubric than the one Pattern Instruction 1.36 establishes. In this regard, she cites for the first time before us the salient federal cases that have embraced the MPC's linguistic formulation of the duress defense and, more specifically, its "in his situation" language, in holding that evidence of a psychological condition arguably akin to PTSD (i.e., BWS) might be factored into the duress calculus. *See* Aplt.'s Opening Brief at 12 (citing *Marenghi* in arguing that "[i]t is informative for the Court to look at the whole picture and not just the snapshot of the time immediately prior to the theft to assess the viability of the defense of

28

duress"); *id.* at 14–15 (citing *Johnson*, in contending that "Ms. Dixon suffered from repeated abuse such that a reasonable juror could find that her fears were well-grounded"); Aplt.'s Reply Br. at 8 (citing *Nwoye II*, in asserting that "[t]o understand the reasonableness of the response, or lack thereof, one has to understand the effects of long-term abuse"). Yet, even with her citations to cases like *Johnson*, *Nwoye II*, and *Marenghi*, Ms. Dixon still paradoxically points to Pattern Instruction 1.36 for the "three elements" of her defense, Aplt.'s Opening Br. at 11, and does not expressly disclaim that instruction's framework.

The consequence of Ms. Dixon's litigation approach for her arguments on appeal is probably readily apparent, but lest there be any doubt, we state the matter plainly: Ms. Dixon has failed to preserve any opportunity to argue for reversal under a duress-defense rubric other than the one that Pattern Instruction 1.36 defines. Notably, she forfeited such an argument before the district court, and has waived it before us by failing to "run the gauntlet created by our rigorous plain-error standard of review." *United States v. McGehee*, 672 F.3d 860, 876 (10th Cir. 2012). *See, e.g.*, *Havens v. Colo. Dep't of Corrs.*, --- F.3d ----, No. 16-1436, 2018 WL 3580861, at *6 (10th Cir. July 26, 2018) ("We conclude that Mr. Havens has forfeited the argument that Title II validly abrogates sovereign immunity as to his claim by failing to raise this argument before the district court, and he has effectively waived the argument on appeal by not arguing under the

rubric of plain error."); *Fish v. Kobach*, 840 F.3d 710, 729–30 (10th Cir. 2016) (noting that a forfeited argument not pursued under the plain-error framework on appeal may be deemed "effectively waived"); *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011) (discussing the circumstances giving rise to forfeiture).

\*\*\*

In light of the foregoing, we conclude that the district court did not err in rejecting Ms. Dixon's duress defense and her tendered duress instruction. Specifically, under the framework of Pattern Instruction 1.36—which Ms. Dixon herself endorsed—she could not show that she had no reasonable, legal alternative to violating the law.

**III**

For the foregoing reasons, we **AFFIRM** the district court's judgment.