**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**April 21, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

FABIAN COBOS CARPENA,

    Defendant - Appellant.

No. 25-5046

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:24-CR-00173-SEH-1)**
_____

William D. Lunn, Jr., Tulsa, Oklahoma, appearing for Appellant.

Elliot Anderson, Assistant United States Attorney (Clinton J. Johnson, United States Attorney, with him on the brief), Office of the United States Attorney for the Northern District of Oklahoma, Tulsa, Oklahoma, appearing for Appellee.
_____

Before **MATHESON**, **EBEL**, and **CARSON**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

Fabian Cobos Carpena pled guilty to Unlawful Reentry of a Removed Alien in violation of 8 U.S.C. § 1326, reserving the right to appeal the district court's denial

of his motion for a jury instruction on a duress defense.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

### A. *Factual History*[1]

#### 1.  **2010 to 2013 - Initial Entry and Deportation**

Mr. Cobos Carpena was 16-years-old and living in Mexico when Rosanna Miranda Torres, a 29-year-old American citizen, contacted him online. Despite their age difference, according to Mr. Cobos Carpena's declaration, they "developed a long-distance relationship."  ROA, Vol. I at 46.

Ms. Torres convinced Mr. Cobos Carpena to come to the United States.  She organized his border crossing.  She sent men to transport him across the border, resulting in his illegal entry into the United States, but they did not immediately release him or deliver him to Ms. Torres.  Instead, they held him in Texas for approximately three weeks, constantly "threatening" him and "feeding [him] poorly." *Id.*  They told him to "obey all" of Ms. Torres's orders or "they would hurt [him]"

---

[1] Mr. Cobos Carpena's motion for a duress jury instruction included a written factual offer of proof.  He supplemented his offer of proof with exhibits, including his own declaration, a protective order application, police reports, and letters from his sister, nephew, and ex-girlfriend.  We draw the facts primarily from Mr. Cobos Carpena's declaration.

To determine whether the evidence was sufficient to warrant a duress jury instruction, "we review the evidence in the light most favorable to the defendant," *United States v. Dixon*, 901 F.3d 1170, 1178 (10th Cir. 2018), and "we must give full credence to defendant's testimony," *United States v. Yazzie*, 188 F.3d 1178, 1185 (10th Cir. 1999) (quotations omitted).

and that his "only choices were to be sent to [Ms. Torres] or to be killed." *Id.* After they turned him over to Ms. Torres, she brought him to Oklahoma City, Oklahoma.

Mr. Cobos Carpena had family in Tulsa, but Ms. Torres prohibited him from seeing them. She told him to "only do what she ordered" and warned that "if [he] didn't obey her, [he] was going to be sent back to Mexico and that the men who picked [him] up would kill [him] at the border." *Id.*

From 2010 to 2013, Mr. Cobos Carpena lived with Ms. Torres in her apartment and faced regular abuse and threats from her. She locked him in the apartment, forced him to have sex with her, and ordered him to complete tasks such as picking up people and packages "without any explanation." *Id.* at 47. Ms. Torres told him he "had to do everything to please her and make her happy so she wouldn't kill [him.]" *Id.* Although she restricted his contact with family, he joined relatives on occasion at "casual dinners" and family events. *Id.* at 53-54. But Mr. Cobos Carpena's sister said she sometimes could not get hold of her brother for days.

In 2013, Ms. Torres ordered Mr. Cobos Carpena to pick up some people who had been stealing cars. He was arrested with them. He "tried explaining to the police that [he] was acting under threats from a group of people." *Id.* at 47. Following his conviction for burglary and obstructing a police officer, he was removed to Mexico.

## 2. **2013 to 2023 - Reentry and Continued Abuse**

When Mr. Cobos Carpena arrived in Mexico, Ms. Torres's men immediately kidnapped him. They held him for three weeks—beating him daily, interrogating him about "what [he] said to the authorities," and feeding him along with the dogs.

3

*Id.* at 48.  The men were armed and repeatedly threatened him but decided not "to kill [him] this time" because he "never gave [Ms. Torres] away." *Id.*  They transported him back to the United States, which was his illegal reentry, and returned him to Ms. Torres.

Ms. Torres's abuse intensified upon his return.  She said his "sole job was to obey her every word" and that "the only way [he] was getting rid of her was by getting killed or being sent to prison." *Id.*  She used physical beatings and humiliation to control and punish him.  In his declaration, he described beatings as "a normal occurrence in the house." *Id.* at 49.  She knocked out his teeth, broke a broom across his back, and "threatened [him] with a knife for a long period of time." *Id.*

Mr. Cobos Carpena's nephew recalled "one occasion" when his uncle asked to be picked up "after [Ms. Torres] physically abused him and abandoned him without shoes, crying, and with bruises." *Id.* at 53.  Ms. Torres also controlled his access to food, clothes, and the apartment.  She "took [his] clothes away and forced [him] to walk around the block in nothing but [his] underpants," "drugged [him] so that [he] would be easy to handle" by "slip[ping] things in [his] food and drinks," and "locked [him] outside the house." *Id.* at 48.

Mr. Cobos Carpena continued to have some contact with his family, but Ms. Torres started to harass them, threatening to hurt his family if he was deported and having her men "shoot up" his sister's house in 2022. *Id.* at 49.

4

3. **April 30, 2023 - Escape**

On April 30, 2023, Mr. Cobos Carpena escaped from Ms. Torres's apartment. He had purchased a truck for his father, but when the truck arrived, Ms. Torres kept it and took his "keys, . . . clothes, and $1,000" in his wallet. *Id.* Then she physically attacked him—grabbing his neck, burying her nails in his throat so that he couldn't speak, and putting a knife against his throat. Mr. Cobos Carpena "struggled with her and managed to get away." *Id.* at 50. As he ran away, she chased him in the truck, attempted to run over him, and yelled that "she was going to get [him] killed." *Id.* One of her men also followed and pulled a gun on Mr. Cobos Carpena, but he got away.

4. **2023 to 2024 - Post-Escape Events**

After he escaped, Mr. Cobos Carpena moved to his sister's house in Tulsa, but Ms. Torres continued to harass him and his family.

On May 8, 2023, Ms. Torres filed a petition for a protective order against Mr. Cobos Carpena in Tulsa County District Court based on the April 30 incident. On May 22, 2023, Mr. Cobos Carpena attended a hearing on the petition, but Ms. Torres did not appear, so the district court dismissed it for failure to prosecute.

That same day, Mr. Cobos Carpena requested his own protective order, reporting the April 30 incident and the years of physical abuse, threats, harassment, and stalking. He also referenced his immigration status, stating Ms. Torres always threatened to "call[] ICE on me since I [don't] have papers with SS ID to be here."

5

*Id.* at 67.  When Ms. Torres failed to appear for the hearing on his petition, the Tulsa County District Court granted a one-year protective order.

Despite the protective order, Ms. Torres continued to harass and threaten Mr. Cobos Carpena, his family, and his new girlfriend.  She "sent a group of her men to shoot at [his] sister's house again."  *Id.* at 50.  On "two different occasions," a "man connected to [Ms. Torres] showed up to his sister[']s house with a gun."  *Id.* at 81.  "[T]he first time the gun was pointed at him and verbal threats of harm were made; the second time shots were fired into the home."  *Id.*  He moved multiple times, but Ms. Torres discovered where he was staying.

In June 2023, Mr. Cobos Carpena filed a police report against Ms. Torres for harassment, stating she would drive by his family's house and his work "yelling she is calling immigration on them."  *Id.* at 79.  In August 2023, Mr. Cobos Carpena's new girlfriend also filed a police report stating:

> Rosanna Torres has been harassing [Mr. Cobos Carpena] like trying to stop us on the streets screaming things out that she's never gonna leave him alone.  She's gonna have him hurt. . . . She goes around his job, honking, throwing stuff, following him in her car yelling at him.  That immigration is going to take him and he's going back to Mexico where [s]he's going to have him killed with a cartels [sic].  She also has his family threatened and they're scared to make police reports. . . .  Fabian has moved a couple of times already because she always finds out where he's staying at.  This has been continuing for months and nobody ever does anything.

*Id.* at 80.

With the newfound distance from Ms. Torres, Mr. Cobos Carpena sought counseling for his prolonged abuse and trauma. From October 2023 to February 2024, he attended individual counseling with Domestic Violence Intervention Services, Inc. ("DVIS"). During his intake for the "Adult Outpatient Survivors program," he "reported having suffered financial, verbal, emotional, psychological, and physical abuse by" Ms. Torres, including "severe threats, coercion and intimidation." *Id.* at 82.

In March 2024, Mr. Cobos Carpena started preparing a T-Visa application, which allows certain victims of human trafficking to remain in the United States. *See* 18 U.S.C. § 1101(a)(15)(T); 8 C.F.R. § 214.202.

B. *Procedural History*

1. **Illegal Reentry Indictment**

On April 12, 2024, Mr. Cobos Carpena was arrested for domestic assault and battery by strangulation based on the April 30, 2023 incident. After Ms. Torres failed to appear for the preliminary hearing, the State moved to dismiss the charges. But during routine booking procedures, the Tulsa County Sheriff's Office confirmed that Mr. Cobos Carpena had been removed from the United States in 2013. As a result, he was transferred to federal custody and indicted on one count of Unlawful Reentry of a Removed Alien in violation of 8 U.S.C. § 1326.

The indictment charged:

> On or about April 12, 2024, in the Northern District of Oklahoma, the defendant, **FABIAN COBOS CARPENA**, an alien, was found in the United States after having been deported and removed therefrom on about

7

June 21, 2013, at or near Del Rio, Texas, and thereafter knowingly entered the United States without previously receiving the express consent of the proper legal authority to reapply for admission to the United States.

All in violation of Title 8, United States Code, Section 1326.

ROA, Vol. I at 17.

## 2. Motion for Duress Instruction

Mr. Cobos Carpena filed a notice of intent to present a duress defense and a motion for a duress jury instruction. His supporting factual offer of proof detailed Ms. Torres's abuse from 2010 to 2023. He submitted materials from his T-Visa application, including his declaration, letters from his family and DVIS, his protective order petition, and his police reports. The Government opposed his motion and moved in limine to preclude the defense. It argued Mr. Cobos Carpena could not present a duress defense because he could not prove "he was forced into entering and remaining in the United States" and he "made no bona fide effort to surrender to law enforcement in all the time he has been back in the United States," "despite multiple opportunities to do so." *Id.* at 25-26.

The district court denied Mr. Cobos Carpena's motion for a duress instruction and granted the Government's motion in limine. It concluded he failed to proffer sufficient evidence for a jury to find duress by a preponderance in his favor.

## 3. Plea and Sentencing

Mr. Cobos Carpena entered a conditional guilty plea, reserving his right to appeal the district court's duress motion ruling. The district court accepted the guilty

plea and sentenced him to time served. He was then surrendered to immigration authorities for deportation proceedings.

## II.  DISCUSSION

### A. *Legal Background*

#### 1. Unlawful Reentry

Section 1326(a) provides for the prosecution of "any alien" who, having been previously deported, reenters the United States without the consent of the Attorney General. 8 U.S.C. § 1326(a). It provides that the offense of unlawful reentry occurs when a previously deported "alien . . . enters, attempts to enter, or is at any time found in, the United States." *Id.*

"[I]llegal re-entry after deportation is a continuing offense. It occurs not just when the previously-deported individual steps across the border without permission to do so but continues as long as that individual remains in the United States." *United States v. Portillo-Vega*, 478 F.3d 1194, 1201 (10th Cir. 2007) (citation omitted).

#### 2. Duress

Duress excuses otherwise unlawful conduct when the defendant was forced to commit the crime. *See Dixon v. United States*, 548 U.S. 1, 6 (2006). "A duress defense requires the establishment of three elements: (1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm." *United States v. Arias-Quijada*, 926 F.3d 1257, 1260 (10th Cir. 2019) (quoting *Portillo-Vega*,

478 F.3d at 1198).  The defendant must prove each element by a preponderance of the evidence.  *Portilla-Vega*, 478 F.3d at 1197.

On the third element, "if there was a reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm, the defense[] will fail."  *United States v. Bailey*, 444 U.S. 394, 410 (1980) (quotations omitted); *see also United States v. Al-Rekabi*, 454 F.3d 1113, 1123 (10th Cir. 2006).  Even brief periods away from the threatening individual or circumstances provide an escape opportunity.  *See United States v. Glass*, 128 F.3d 1398, 1409 (10th Cir. 1997).  A defendant must take the "earliest possible opportunity" to escape the threatened harm and to comply with the law.  *Bailey*, 444 U.S. at 415; *see also Al-Rekabi,* 454 F.3d at 1124.

Further, to satisfy the third element for a continuing offense, the defendant must "proffer evidence of a bona fide effort to surrender as soon as the claimed duress . . . lost its coercive force."  *Id.* (quoting *Portillo-Vega*, 478 F.3d at 1201); *see United States v. Zaragoza-Moreira*, 780 F.3d 971, 978 (9th Cir. 2015) ("To satisfy the third element, . . . [a] defendant must present some evidence indicating that he took the opportunity to escape the threatened harm by submitting to authorities at the first reasonable opportunity." (quotations omitted)).[2]

---

[2] We have evaluated a defendant's efforts to surrender under the first duress element.  *See, e.g., United States v. Butler*, 485 F.3d 569, 573-74 (10th Cir. 2007).  But most of our cases consider it under the third.  *See, e.g., Al-Rekabi*, 454 F.3d at 1123-24 (holding defendant "fail[ed] to exhaust legal alternatives" because he did not "report the stolen pistol to the police"); *Portillo-Vega*, 478 F.3d at 1201-02 (holding defendant failed to carry his burden "on the third element" because "he made no attempt to contact law

To receive a duress instruction, the defendant must present sufficient evidence for a jury to find each duress element by a preponderance of the evidence, *Dixon*, 901 F.3d at 1177; *see id.* at 1177 n.4, and "the testimony most favorable to the defendant should be accepted," *Al-Rekabi*, 454 F.3d at 1121 (quotations omitted). If the defendant's "evidence is lacking as to any element," the district court "may properly disallow the defense as a matter of law and refuse to instruct the jury." *Scott*, 901 F.2d at 873.

3. **Standard of Review**

We review a district court's denial of a duress instruction for abuse of discretion. *Arias-Quijada*, 926 F.3d at 1259-60. We "will reverse the district court only 'if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" *Dixon*, 901 F.3d at 1176 (quoting *Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281, 1289 (10th Cir. 2005)). "[W]hether there is sufficient evidence to constitute a triable issue of the defense is a question of law." *Id.* at 1177 (brackets omitted) (quoting *United States v. Gutierrez-Gonzalez*, 184 F.3d 1160, 1164 (10th Cir. 1999)). A district court therefore abuses its discretion when it denies a defense instruction supported by sufficient evidence. *United States v. Britt*, 79 F.4th 1280, 1291-92 (10th Cir. 2023); *see also United States v. Ortiz*, 804 F.2d

---

enforcement officers"); *Glass*, 128 F.3d at 1409 (same); *United States v. Scott*, 901 F.2d 871, 874 (10th Cir. 1990) (same).

1161, 1163-64 (10th Cir. 1986) (holding the "failure to allow a defendant to present a theory of defense which is supported by sufficient evidence is reversible error").

## B. *Analysis*

Mr. Cobos Carpena failed to produce sufficient evidence on the third element to receive a duress instruction—that he lacked a reasonable opportunity to escape the threatened harm or that he promptly made a bona fide effort to surrender once the duress lost its coercive force.

His duress evidence is strongest at the point where Ms. Torres's armed men brought him back to the United States shortly following his deportation to Mexico in June 2013. But, as explained above, illegal reentry under § 1326(a) is a continuing offense—it "continues as long as that individual remains in the United States." *Portillo-Vega*, 478 F.3d at 1201. And Mr. Cobos Carpena remained in the United States for the next 11 years, when he was indicted in June 2024. He argues that he was under duress the entire time and made a bona fide effort to surrender at the earliest reasonable opportunity, but he has not shown enough for a duress instruction.

1. **Reasonable Opportunity to Escape and Surrender – 2013 to April 2023**

Although Ms. Torres abused and controlled Mr. Cobos Carpena for more than a decade, he had numerous opportunities to escape and surrender before April 2023. He reported running errands for Ms. Torres and leaving the house after one of her assaults. He proffered that "family members will testify that [Ms. Torres] would drop him off at their house [or] in open fields without his clothes on at all hours of

the night."  ROA, Vol. I at 29.  His nephew described "one occasion" when

Mr. Cobos Carpena asked to be picked up after Ms. Torres abandoned him.  *Id.* at 53.

Mr. Cobos Carpena's petition for a protective order said the April 30 incident started

when Ms. Torres called him to come to the apartment from somewhere else.  He also

saved enough money to purchase a truck and had $1,000 in his wallet on

April 30, 2023.

Based on his episodic physical separation from Ms. Torres, contact with

family, and financial resources, Mr. Cobos Carpena had various reasonable

opportunities to escape Ms. Torres's clutches.  He could have escaped when running

an errand, stayed at his sister's house, and asked his nephew to pick him up; and he

had cash to use for transport.  His opportunities for escape far exceeded those in

*Glass*, where we held the defendant failed to show she lacked a reasonable

opportunity to escape because "the man who allegedly threatened her life and the life

of her child" left her alone for "approximately thirty minutes" and "did not

accompany [her] on the plane from Los Angeles to Dallas, or from Dallas to

Oklahoma City."  128 F.3d at 1409.[3]

---

[3] Mr. Cobos Carpena contends he "had to deal with [Ms.] Torres every day, and his movements, all local, were under constant surveillance."  Aplt. Br. 37. Constant surveillance may reduce and even eliminate reasonable opportunities to escape, *see Scott*, 901 F.2d at 873 (contrasting defendant's circumstances with those involving "constant surveillance" or "physical presence" throughout the criminal activity), but he has not presented sufficient evidence of constant surveillance. Rather, the record shows he left the house on his own and was occasionally away from Ms. Torres with his family.

Mr. Cobos Carpena also could have reported the abuse to the police. We have recognized that "[t]he ability to contact law enforcement will generally constitute a reasonable alternative to illegal activity." *United States v. Beckstrom*, 647 F.3d 1012, 1016 (10th Cir. 2011). He had access to a phone and has not explained what prevented him from contacting law enforcement outside of Ms. Torres's presence.

We therefore agree with the district court that Mr. Cobos Carpena failed to establish he had no reasonable opportunity to escape during the ten years he lived with Ms. Torres. *See United States v. Meraz-Valeta*, 26 F.3d 992, 995 (10th Cir. 1994) (holding "there were reasonable, legal alternatives open" because defendant could have contacted police or contacted his sister-in-law), *overruled in part on other grounds by, United States v. Aguirre-Tello*, 353 F.3d 1199, 1208 (10th Cir. 2004) (en banc).[4]

## 2. Escape on April 30, 2023

On April 30, 2023, Mr. Cobos Carpena ran away from Ms. Torres's apartment. In the ensuing weeks and months, he moved in with his sister, obtained a protective

---

[4] Mr. Cobos Carpena argues the district court erred "in finding, simply because of the passage of time, that there must have been some day when he could have escaped." Aplt. Reply Br. at 9. We do not read the district court's ruling that way. Although "usually, when a defendant's conduct spans a period of time, there are other alternatives to the illegal conduct," *Butler*, 485 F.3d at 576; *see also Dixon*, 902 F.3d at 1180, we do not foreclose the possibility of a duress defense for a prolonged period of criminal activity. But like the district court, our conclusion that Mr. Cobos Carpena failed to establish he had no reasonable opportunity to escape during the 10 years he lived with Ms. Torres turns on his opportunities for escape reflected in the record, not the passage of time.

order against Ms. Torres, filed police reports against her, and sought counseling. Even if these actions alone or together show that Mr. Cobos Carpena took reasonable steps to escape, April 30, 2023 was not his earliest opportunity to do so, which our precedent requires for a duress instruction. *See Butler*, 485 F.3d at 573; *Al-Rekabi*, 454 F.3d at 1123. He fails to show otherwise. *Dixon*, 901 F.3d at 1179 (quotations omitted). So his appeal fails on this ground alone.

### 3. Efforts to Surrender – After April 30, 2023

Even if Mr. Cobos Carpena had no reasonable opportunity to escape before April 30, 2023, his duress evidence still falls short. He must "proffer evidence of a bona fide effort to surrender . . . as soon as the claimed duress or necessity had lost its coercive force." *Bailey*, 444 U.S. at 415. Waiting even two to four days after the duress has lost its coercive force precludes a duress defense. *Butler*, 485 F.3d at 574 (holding duress "instruction was properly refused" where defendant "continued to possess the gun for two to four days" after "the danger had clearly dissipated"); *Al-Rekabi*, 454 F.3d at 1123 (holding "necessity defense [was] unavailable" for defendant who failed to report or return a stolen pistol for three days).

Mr. Cobos Carpena waited more than three weeks. He escaped Ms. Torres on April 30, 2023, and first disclosed his immigration status in his protective order petition on May 22, 2023.[5] He argues that Ms. Torres continued to threaten him after

---

[5] The parties dispute whether his petition for a protective order should constitute a bona fide effort to surrender. Aplt. Br. at 39-40; Aplee. Br. at 11 n.2;

his escape, so May 22 was "the very first reasonable opportunity he had" to go to law enforcement. Aplt. Reply Br. at 12; *see also* Aplt. Br. at 39. But even if the threats continued, he does not claim, let alone show, that she prevented him from contacting law enforcement during the three-week span. *Beckstrom*, 647 F.3d at 1017 (defendant failed to claim he was prevented "from reaching out to police during the entire two-week span").

Once Mr. Cobos Carpena was no longer living with Ms. Torres, the danger she posed dissipated. He has not shown that his failure to surrender to law enforcement in a timely manner was reasonable or the product of duress. *Butler*, 485 F.3d at 573 (Because the "defendants failed to turn themselves in at the 'earliest possible opportunity,' which was 'an indispensable element of the defense of duress or necessity,' they were not entitled to the instruction." (quoting *Bailey*, 444 U.S. at 415)).

\* \* \* \*

In sum, Mr. Cobos Carpena "could have done any number of things." *Dixon*, 901 F.3d at 1180. Because he "did not pursue any of those options" or explain how "those alternatives were unavailable," he failed to show that he could prove by a preponderance that he had no reasonable opportunity to escape the threatened harm or that he promptly made a bona fide effort to surrender once the duress lost its

---

Aplt. Reply Br. at 12-13. We need not resolve this dispute because Mr. Cobos Carpena waited too long to file the petition.

coercive force. *Id.* The district court did not abuse its discretion in denying his request for a duress jury instruction.

## III. **CONCLUSION**

We affirm the district court's judgment.